IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TIFFANY NEAL

    *Plaintiff*,

v.

    Civil Action No. ELH-18-451

PENTAGON FEDERAL CREDIT
UNION,

    *Defendant*.

**MEMORANDUM OPINION**

Plaintiff Tiffany Neal, a disabled veteran, filed a class action suit against Pentagon Federal Credit Union ("PenFed"), defendant. ECF 1 (the "Complaint"). In a "First Amended Class Action Complaint" (ECF 13, the "Amended Complaint"), she alleges that PenFed unlawfully withdrew disability benefits from her PenFed deposit account to cover overdue loan payments. Pursuant to Fed. R. Civ. P. 23(b)(3) and (b)(2), Neal brings the action "on behalf of herself and all other similarly situated veterans who have deposit accounts with PenFed and have received disability benefits through these same accounts which were . . . taken to cover loan defaults." ECF 13, ¶ 4.[1]

In her Amended Complaint, Neal asserts the proverbial kitchen sink of claims. She contends that PenFed's seizure of her benefits violated her federal rights under 38 U.S.C. § 5301, which statutorily protects disability benefits owed to veterans; the Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.* ("TILA"); and the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693 *et*

---

[1] Plaintiff filed her original complaint on February 13, 2018. *See id.* Defendant moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim. ECF 6. By Order of March 28, 2018, I granted plaintiff's motion for leave to file an amended complaint, and denied defendant's motion to dismiss as moot. ECF 13. That same day, plaintiff filed her Amended Complaint. ECF 13.

*seq.* ("EFTA"). *Id.* ¶ 6. In addition, she asserts State claims for breach of contract, negligence, negligent misrepresentation, constructive trust, accounting, unjust enrichment, conversion, as well as a violation of the Maryland Consumer Protection Act ("MCPA"), Md. Code (2013 Repl. Vol., 2017 Supp.), §§ 13-101 *et seq.* of the Commercial Law Article ("C.L."). *Id.* ¶¶ 85-140. Neal seeks damages and injunctive relief, in addition to attorneys' fees and costs. *Id.* ¶ 4.

PenFed has moved to dismiss the Amended Complaint, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim. ECF 16 (the "Motion"). The Motion is supported by six exhibits. *See* ECF 16-1 to ECF 16-6. In the Motion, defendant argues that all claims fail as a matter of law. *Id.* at 1. Neal opposes the Motion. ECF 17 ("Opposition"). PenFed has replied. ECF 18 ("Reply").

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, the Motion shall be granted in part and denied in part.

## I.    Factual Background[2]

PenFed is a "United States federal credit union headquartered in McClean, Virginia, chartered and regulated under the authority of the National Credit Union Administration." ECF 13, ¶ 11. It "operates numerous locations in Maryland," but also has locations in Washington, D.C., Virginia, and at several military bases. *Id.*

Neal is a disabled, honorably discharged veteran of the United States Army. *Id.* ¶ 10. In or around 2002, Neal opened an account with PenFed. *Id.* ¶ 14. Since then, "Neal has maintained several accounts" with PenFed (*id.* ¶ 15), including a deposit account in which "Neal

---

[2] Given the procedural posture of this case, I must assume the truth of all factual allegations in the Amended Complaint. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). Additionally, where relevant facts are contained in exhibits incorporated into the pleadings (discussed, *infra*), I shall refer to those exhibits, as well.

has received her Veteran disability benefits." *Id*. ¶ 16.  Neal has relied on these benefits to "meet all her basic needs" and to "maintain and support her family and dependents." *Id*. ¶ 17.

In addition, "Neal entered into an agreement to access a loan and credit from PenFed." *Id*. ¶ 18.  Neal has two loan accounts with PenFed.  *Id*.  Plaintiff asserts that she "did not Specifically [sic] authorize electronic funds transfer and/or assignment of her disability benefits to [PenFed] in the event of a default on repayment of any of the loans or lines of credit." *Id*. ¶ 20.  Moreover, plaintiff asserts that, "[d]ue to the increased financial burden caused by sudden health emergencies she suffered," she "ended up defaulting on her monthly payments to PenFed on the loan accounts." *Id*. ¶ 21.  According to Neal, she "informed [PenFed] of the financial difficulties she was facing." *Id*. ¶ 22.

On June 28, 2017, Neal "received a direct deposit of her Veterans disability benefits . . . in the amount of $3,282.78." *Id*. ¶ 23.  However, on July 4, 2017, PenFed transferred $49.66 of her disability benefits "to cover a delinquency on her loans accounts without Neal's knowledge, authorization or consent." *Id*. ¶ 24.  That same day, PenFed "subjected" Neal "to a $35.84 interest charge . . . and a $227.14 finance charge" on her loan accounts.  *Id*.  PenFed also "transferred $559.26 of [Neal's] veteran's disability benefits from her" deposit account "to cover a default on repayment of her loan." *Id*. ¶ 25.  Further, Neal contends that she "was not immediately notified that her veteran's disability benefits had been taken out by PenFed." *Id*. ¶ 25.

A few weeks later, on July 29, 2017, Neal received another direct deposit of benefits in the amount of $3,282.78.  *Id*. ¶ 26.  Neal claims that on August 2, 2017, PenFed again "transferred $550.65 of [Neal's] veteran disability benefits" from her deposit account "to cover a loan payment delinquency without her knowledge, authorization or consent." *Id*. ¶ 27.

On August 30, 2017, Neal received another direct deposit of $3,282.78. *Id*. ¶ 28. And, on September 2, 2017, defendant "transferred $559.26 of [Neal's] Veteran Disability Benefits . . . to cover a default on repayment of her loans." *Id*. ¶ 29.

Then, Neal received a fourth direct deposit of $3,282.78 on September 27, 2017. *Id*. ¶ 30. Over the following week, PenFed withdrew money on three separate occasions—$1,124.00 on September 28, 2017, and $59.05 and $551.59 on October 3, 2017—"to repay a delinquency on her loans." *Id*. ¶¶ 31-33.

Neal emphasizes that "[f]or all of the foregoing withdrawals PenFed never gave Neal notice that her veteran's disability benefits would be unilaterally taken out to repay any loan delinquencies on her loan accounts with PenFed." *Id*. ¶ 34. Further, Neal maintains that "PenFed never notified Neal which specific loan delinquencies [were] being repaid." *Id*. ¶ 35. Moreover, Neal argues that PenFed's "assignment of funds from deposit accounts of members without prior notice deprived Neal" and others of their veterans' benefits. *Id*. ¶ 42.

Additional facts are included in the Discussion.

## II.     Legal Standards

### A.     Rule 12(d)

Defendant's Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6). However, buried in a footnote (ECF 16 at 3 n.4), PenFed asks the Court to consider the Motion, in the alternative, as one for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the Court's discretion under Fed. R. Civ. P. 12(d). *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th

Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1366 (3d ed. 2018). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.*

In my view, the footnote in defendant's Motion does not provide adequate notice that it "could be disposed of as one for summary judgment." *Laughlin*, 149 F.3d at 261; *see also Tsai v. Md. Aviation*, 306 F. App'x 1, 4 (4th Cir. 2008) (finding that the defendant's caption "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" provided notice of Rule 12(d) conversion). Therefore, I shall consider the Motion as one for dismissal under Rule 12(b)(6).

## B.     Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6).  *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom., McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . .") (citation omitted); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby, Miss.*, ___ U.S. ____, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440 (citations omitted); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Soc'y Without a Name v. Cmm'w of Va.*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts generally do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quotation marks and citation omitted). The purpose of the rule is to ensure that defendants are

"given adequate notice of the nature of a claim" made against them. *Twombly*, 550 U.S. at 555-56. But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 533 F.3d 334, 336 (4th Cir. 2009); *see also U.S. ex rel. Oberg v. Penn. Higher Educ. Assistance Agency*, 745 F.3d 131, 148 (4th Cir. 2014). However, because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint*.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis added in *Goodman*).

## C.     Rule 9(b)

To the extent that the Amended Complaint lodges a claim of fraud, Fed. R. Civ. P. 9(b) is pertinent.

As a preliminary matter, claims that sound in fraud, whether rooted in common law or arising under a statute, implicate the heightened pleading standard of Fed. R. Civ. P. 9(b). *See, e.g.*, *E-Shops Corp. v. U.S. Bank N.A.*, 678 F.3d 659, 665 (8th Cir. 2012) ("Rule 9(b)'s heightened pleading requirement also applies to statutory fraud claims."); *see also Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (stating that an MCPA claim that "sounds in fraud[] is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b)").

Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of

a person's mind may be alleged generally." Under the rule, a plaintiff alleging claims that sound in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *United States ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.,* 612 F.3d 724, 731 (4th Cir. 2010) (citation omitted). In other words, "'Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Crest Construction II, Inc. v. Doe,* 660 F.3d 346, 353 (8th Cir. 2011) (citation omitted).

Rule 9(b) serves several salutary purposes:

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (citation omitted).

Notably, however, Rule 9(b) by its plain text permits general averment of aspects of fraud that relate to a defendant's state of mind. And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D.

Md. 1997) (quoting *Flynn v. Everything Yogurt*, HAR-92-3421, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)).

## D.     Exhibits

Under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448).  In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits."  *Goines*, 822 F.3d at 166 (citation omitted); *see also U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)).  Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the

plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id*.

Neal did not attach any exhibits to her Amended Complaint. But, FedPen attached six exhibits to its Motion. ECF 16-1 to ECF 16-6. These include the Promissory Note (ECF 16-1) that appears to be signed by "Tiffany Neal"; the Membership Agreement (ECF 16-2), which defines the terms of membership for PenFed account holders; and the Cardholder Agreement (ECF 16-3), which details the terms and agreements of a PenFed credit card. The Membership Agreement and the Cardholder Agreement are both unsigned. ECF 16-2 at 2; ECF 16-3 at 2-4. PenFed also appended to the Motion excerpts from Neal's bank statements for the period June 25, 2017, through October 25, 2017 (ECF 16-4, the "Consolidated Bank Statements"), as well as an excerpt from Neal's credit card statement of October 2, 2017. ECF 16-5 (the "Credit Card Statement"). Finally, FedPen submitted a letter of September 28, 2017, from the "Delinquency Control Center" to Neal, notifying Neal that funds were taken from her savings account "to pay the past due amount" on her credit card account. ECF 16-6 (the "Notification Letter").

The Promissory Note is integral to the Amended Complaint because it is referenced repeatedly, and because it appears to be the basis of the Amended Complaint. ECF 13, ¶¶ 13, 18, 78, 86-88, 90, 93. But, Neal objects to the authenticity of the Promissory Note. ECF 17 at 13. Specifically, she claims that PenFed never provided her with a copy of the Promissory Note. *Id*. In response, PenFed stresses that the Amended Complaint "explicitly admits that the loan agreement is an 'enforceable contract' that was 'signed by plaintiff.'" ECF 18 (citing ECF 13, ¶¶ 88, 130).

In paragraph 130 of the Amended Complaint, Neal states, in part: "The loan agreement signed by plaintiff and PenFed is in violation of 38 U.S.C.S. § 5301 and is accordingly void." However, it is not clear if the loan agreement and the Promissory Note are one and the same.

As noted, the general rule is that "extrinsic evidence should not be considered at the 12(b)(6) stage." *Am. Chiropratic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004). "At the motion to dismiss stage, documents attached to a motion to dismiss need not be accompanied by a formal declaration authenticating them." *Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512-13 (4th Cir. 2018) (quotation marks and citation omitted). However, the Fourth Circuit has concluded "that when a defendant attaches a document to its motion to dismiss, a court may consider it in determining whether the dismiss the complaint if it was integral to and explicitly relied on in the complaint and *if the plaintiffs do not challenge its authenticity*." *Id.* (internal quotation marks, parentheses, and citation omitted) (emphasis added).

Although the Amended Complaint references a loan agreement Neal signed with PenFed (ECF 13, ¶¶ 88, 130), Neal has not admitted that the proffered Promissory Note is, in fact, the agreement she signed. Despite PenFed's assertions that the agreement is authentic, there is no other evidence supporting the authenticity of the document, aside from what appears to be Neal's signature on the Promissory Note. ECF 16-1 at 2. Therefore, at this juncture, I decline to consider the Promissory Note as evidence.

In addition, Neal questions the authenticity of the Membership and Cardholder Agreements. ECF 17 at 13. As a result, I may not consider those exhibits. But, even if those agreements were of unquestioned authenticity, neither document is incorporated into the Amended Complaint. As such, the exhibits are inappropriate to consider in connection with a motion to dismiss. *See Zak*, 780 F.3d at 606 ("Consideration of extrinsic documents during the

pleading stage of litigation improperly converts the motion to dismiss into a motion for summary judgment.").

The Consolidated Bank Statements are foundational to the Amended Complaint, because Neal explicitly relies on them (ECF 13, ¶ 23-33) and does not challenge their authenticity. ECF 17 at 13. The other exhibits—the Credit Card Statement (ECF 16-5) and the September 28, 2017 Notification Letter (ECF 16-6)—are not integral to the Amended Complaint. Therefore, it would be inappropriate to consider them at this stage. *See Zak*, 780 F.3d at 606.

### E.     Choice of Law

Jurisdiction is founded on federal question jurisdiction, supplemental jurisdiction, as well as diversity of citizenship. ECF 13, ¶ 8-9. Neal assumes, without discussion, that Maryland law applies to her State claims. *See* ECF 17 at 16-30. And, one of Neal's State claims is brought under the MCPA. ECF 13, ¶ 164-76. But, PenFed argues that the Amended Complaint "does not allege sufficient facts to determine whether Maryland law applies to Neal's state-law claims." ECF 16 at 8 n.5. For the purpose of this Motion, however, PenFed assumes all State claims are asserted under Maryland law. *Id.*

"When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state." *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011); *see also Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007) (per curiam); *Baker v. Antwerpen Motorcars Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011). Maryland is, of course, the forum state.

As to contract claims, Maryland applies the law of the state in which the contract was formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of

another state. *See, e.g., Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela Power Co.*, 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012), *aff'd*, 437 Md. 372, 86 A.3d 1245 (2014). Neal does not explicitly allege that she entered into the contract while in Maryland, but notes that she resides in Howard County, Maryland (ECF 13, ¶ 10); that PenFed "operates numerous locations in Maryland" (*id.* ¶ 11); and that PenFed was engaged in "providing a variety of loans, savings and deposit accounts, credit cards and other financial services to Veterans in the State of Maryland . . ." *Id.* ¶ 12. As noted, PenFed does not dispute the application of Maryland law. ECF 16 at 8 n.5. Therefore, as to Neal's contract claims, I shall apply Maryland law.

### F. Class Certification

The question of class certification is not before the Court. At this juncture, Neal need only show that she has stated a cause of action. *Popoola v. M.D. Individual Practice Ass'n, Inc.*, DKC-03-3653, 230 F.R.D. 424, 433 (D. Md. 2005).

Rule 23(c)(1) provides: "At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." As a result, "[e]ither plaintiff or defendant may move for a determination of whether the action may be certified under Rule 23(c)(1)." 7AA Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1785 (3d ed. 2018). Here, neither Neal nor PenFed has moved, pursuant to Rule 23(c)(1), for a ruling on class certification. Thus, whether Neal has satisfied the requirements under Rule 23 for a class action is not ripe for resolution. *See Lesser v. Balt. City Bd. of Sch. Comm'rs*, JKB-17-046, 2017 WL 2733938, at *2 (D. Md. June 26, 2017) ("[A]nalysis of a prospective class's compliance with Rule 23 is not appropriately considered on a motion to dismiss, but should instead be addressed in a motion brought pursuant to Rule

23(c)(1)(a).") (citation omitted); *see also Marx v. Centran Corp.*, 747 F.2d 1536, 1552 (6th Cir. 1984) (noting that to certify a class in a meritless action would "promote inefficiency for its own sake"); *Gilibeau v. City of Richmond*, 417 F.2d 426, 432 (9th Cir. 1969) ("[C]ompliance with Rule 23 is not to be tested by a motion to dismiss for failure to state a claim.").

Even if neither party moves for a Rule 23(c)(1) decision, "the court has an independent obligation to decide whether an action brought on a class basis is to be so maintained." 7AA Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1785 (3d ed. 2018). But, as the Seventh Circuit has noted, "there is no fixed requirement that the court must *always* defer a decision on a Rule 12(b)(6) motion until after the court addresses class certification." *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 879 n.4 (7th Cir. 2012) (emphasis in *McReynolds*). Although "a Rule 12(b)(6) dismissal operates as a final decision on the merits if leave to replead is not granted, it is sometimes appropriate to decide a Rule 12(b)(6) motion ahead of class certification." *Id.* (citing *Twombly*, 550 U.S. 544, 550 (2007) (affirming dismissal of antitrust claims prior to ruling on class certification)).

### III.    Discussion

As indicated, the Amended Complaint contains eleven causes of action:[3] "Violation of 38 U.S.C. § 5301" (Count I); "Breach of Contract" (Count II); "Negligence" (Count III); "Negligent Misrepresentation" (Count IV); "Constructive Trust" (Count V); "Accounting" (Count VI); "Unjust Enrichment" (Count VII); "Conversion" (Count VIII); "Violation of the [EFTA,] 15 U.S.C. § 1693 *et seq.*" (Count IX); "Violation of the [TILA]" (Count X); and "Violation of the [MCPA]" (renumbered as Count XI). ECF 13.

---

[3] Neal refers to each claim as a cause of action. For example, she has a "First Cause Of Action," a "Second Cause Of Action" and so on. I shall refer to each cause as a count. I note that Neal has two claims that are labeled "Tenth Cause Of Action." *See* ECF 13 at 33, 35.

## A.     Count I: Section 5301

Plaintiff asserts a violation of 38 U.S.C. § 5301, which was created "to protect veteran's benefits against their creditors so that the veterans themselves could spend the funds as they saw fit." *Nelson v. Heiss*, 271 F.3d 891, 894 (9th Cir. 2001).   Section 5301(a)(1) provides, in relevant part:

> Payments of benefits due or to become due under any law administered by the Secretary[4] shall not be assignable except to the extent specifically authorized by law, and such payments made to, or on account of, a beneficiary shall be exempt from taxation, shall be exempt from the claim of creditors, and shall not be liable to attachment, levy or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary.

The Supreme Court has recognized two purposes for the statutory protection of veterans' benefits: (1) "to avoid the possibility of the Veterans' Administration being placed in the position of a collection agency," and (2) "to prevent the deprivation and depletion of the means of subsistence of veterans dependent upon these benefits as the main source of their income." *Rose v. Rose*, 481 U.S. 619, 630 (1987) (quotation marks, ellipses, and citation omitted) (discussing 38 U.S.C. § 3101 (1988), the predecessor of § 5301).

First, Neal argues that § 5301 confers an implied private right of action.  ECF 13, ¶ 77; ECF 17 at 7.  Second, assuming § 5301 confers a private right of action, Neal contends that her disability benefits "have exempt status and are non-assignable or non-transferrable from or by any creditors" under § 5301(a).  *Id.* ¶ 75.  Specifically, she asserts that PenFed violated § 5301(a) "as an assignee of rights to receive Neal['s] . . .veterans disability benefits in the event of loan

---

4  The "Secretary" referred to in this provision is the Secretary of the United States Department of Veterans Affairs. *Funeral Fin. Sys. v. U.S.*, 234 F.3d 1015, 1020 (7th Cir. 2000) (citing 38 U.S.C. § 101(1) (1994)).

defaults." *Id.* ¶ 76.  Third, Neal argues that PenFed failed to satisfy the notice requirements provided under 31 C.F.R. § 212 ("Part 212").[5]  ECF 13, ¶ 82.

Private rights of action to enforce federal laws are established by Congress.  *See In re Miller*, 124 F. App'x 152, 154 (4th Cir. 2005) (citation omitted).  When, as here, an explicit private right of action is not established, courts may look to the text, structure, and legislative history of the statute to determine whether Congress has implied a private right of action.  *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  In *Cort v. Ash*, 422 U.S. 66 (1975), the Supreme Court provided a four-factor test that courts must consider in making this determination:

> First, is the plaintiff "one of the class for whose especial benefit the statute was enacted"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?  Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?  And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 78 (citations omitted).

The Fourth Circuit has observed that since *Cort*, "the inquiry has centered more on Congress's intent to create a federal cause of action."  *In re Miller*, 124 F. App'x at 154 (citing *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002); *Sandoval*, 532 U.S. at 286-87)).  "The Supreme Court has gradually receded from its reliance on three of the four *Cort* factors, rather relying on

---

[5] As PenFed points out (ECF 16 at 6), Part 212 is inapplicable here.  The purpose of Part 212 is to "protect Federal benefits from garnishment by establishing procedures that a financial institution must follow when served a garnishment order against an account holder into whose account a Federal benefit payment has been directly deposited."  31 C.F.R. § 212.1.  "Garnishment order" is defined as "a writ, order, notice, summons, judgment, levy or similar written instruction issued by a court, a State or State agency, a municipality or municipal corporation, or a State child support agency."  *Id.* § 212.3.  However, plaintiff has not alleged that PenFed has been served with a garnishment order issued by a government entity.  *See* ECF 13.

legislative intent to create a private right of action as the touchstone of its analysis." *In re Miller*, 124 F. App'x at 154 (quotation marks, ellipses, and citation omitted). Thus, the court reviews whether "the text and structure" of the statute displays "an intent by Congress to create not just a private right, but also a private remedy." *Id.* (quotation marks citation omitted). Under this analysis, "[s]tatutory intent . . . is determinative." *Sandoval*, 532 U.S. at 286.

Neal maintains that § 5301 confers a private right of action because the purpose of the statute "was to protect veteran disability benefits that veterans use for daily sustenance." ECF 17 at 17. She cites a number of authorities, none of which supports her contention that § 5301 creates a federal private right of action. *See id.*

In its Motion, PenFed avers that none of the statute's provisions "evince[s] an intent by Congress to prove a mechanism for beneficiaries to sue private creditors for violating Section 5301." ECF 16 at 4. In particular, PenFed points out that "several members of Congress recently acknowledged that Section 5301 does not create a private right of action by attempting, but failing, to amend it to add a private right of action." *Id.* In 2013, members of the U.S. House of Representatives sponsored a bill that proposed to amend § 5301 by adding, in relevant part: "A benefit recipient may bring an action against a pension assignee in the appropriate Federal or State court and recover . . ." H.R. 3310, 113th Cong. § 3 (2013). As PenFed contends, this "bill would not have been necessary if Section 5301 already authorized beneficiaries to sue private assignees." ECF 16 at 4.

Further, PenFed points out: "If a judgment creditor attempts to attach, levy, or seize exempt funds through any legal or equitable process, the beneficiary can invoke the exemption established by Section 5301 as a defense in the collection action." ECF 16 at 4 (citing 38 U.S.C. § 5301) (quotations marks omitted). Under this scenario, PenFed asserts that "the beneficiary

can take advantage of the protections provided by Section 5301 without the need to sue a private creditor." *Id*.

This point is illustrated in *Porter v. Aetna Cas. & Sur. Co.*, 370 U.S. 159 (1962). In *Porter*, a creditor brought a debt collection action against a veteran who received disability benefits. *Id*. at 159-60. "[I]n an effort to satisfy its judgment," the creditor attached the beneficiary's various bank accounts in which the beneficiary received his disability benefits. *Id*. at 160. In his defense, the beneficiary argued that the funds were protected under 38 U.S.C. § 3101(a), later recodified at 38 U.S.C. § 5301(a). *Id*. The Supreme Court agreed with the beneficiary that "the funds involved . . . are exempt under the statute." *Id*; *see also Burnes v. Smith*, 2018 WL 3472821, *4 (M.D. Tenn. July 17, 2018) ("Section U.S.C. § 5301 appears to provide a defense against the garnishment of veterans' benefits, but it does not create a private right of action").

The text, structure, and legislative history of § 5301 suggest that Congress did not intend to create a private cause of action under § 5301. Nor does this Court have the authority to create one. *See Sandoval*, 532 U.S. at 286-87 ("Without [statutory intent], a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.").

Because Neal does not have a cause of action under § 5301, is it is unnecessary to consider her claim that PenFed violated § 5301(a)(1). Therefore, I shall grant PenFed's Motion with respect to Count I.

### B. Count II: Breach of Contract

In analyzing plaintiff's claim for breach of contract, it is helpful to review the principles of contract formation and contract interpretation.

In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Richard A. Lord, 1 *Williston on Contracts* § 1:1, at 2-3 (4th ed. 1990) (internal quotation marks omitted) (quoting Restatement (Second) Contracts § 1 (1981)); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421-22 (2006), *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006). "'A contract is formed when an unrevoked offer made by one person is accepted by another.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's County v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)). Thus, mutual assent is an integral component of every contract. *See, e.g.*, *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

To determine whether there is an enforceable contract, courts often begin "by discussing the essential prerequisite of mutual assent to the formation of a contract . . . ." *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015); *see also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'" (citations omitted)). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

A contract may be oral or written, as well as express or implied. "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in

writing.'" *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cty. Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000)).  Whether oral or written, a contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement.  *Forty W. Builders, Inc.*, 178 Md. App. at 377-78, 941 A.2d at 1209-10; *see Canaras v. Lift Truck Servs.*, 272 Md. 337, 346, 322 A.2d 866, 871 (1974).  If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable.  *Mogavero v. Silverstein*, 142 Md. App. 259, 272, 790 A.2d 43, 50-51 (2002); *see L & L Corp. v. Ammendale Normal Inst.*, 248 Md. 380, 385, 236 A.2d 734, 737 (1968); *Schloss v. Davis*, 213 Md. 119, 123, 131 A.2d 287, 290 (1957) (stating that a "contract may be so vague and uncertain as to price or amount as to be unenforceable").

Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court."  *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 334-35 (2017) (citation and internal quotation marks omitted); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am. N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017).  This includes the determination of whether a contract is ambiguous.  *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163, 829 A.2d 540, 544 (2003).

"'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (alteration omitted) (quoting *Tomran, Inc. v. Passano*, 391 Md. 1, 14, 891 A.2d 336, 344

(2006)). To determine the parties' intentions, courts look first to the written language of the contract. *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("Generally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement."); *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated."), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997).

"Maryland courts interpreting written contracts have long abided by the law of objective contract interpretation, which specifies that 'clear and unambiguous language' in an agreement 'will not give way to what the parties thought the agreement meant or was intended to mean.'" *Urban Growth Prop. Ltd. P'ship v. One W. Baltimore St. Assocs. LLC*, No. 882, Sept. Term, 2015, 2017 WL 526559, at *5 (Md. Ct. Spec. App. Feb. 9, 2017) (citation omitted) (unpublished); *see Cochran*, 398 Md. at 16, 919 A.2d at 709; *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014). The court's "task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement." *Dumbarton*, 434 Md. at 52, 73 A.3d at 232. Rather, the court is to "'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Id.* (quoting *Gen. Motors Acceptance v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)).

Notably, "'[t]he words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632-33 (2003) (citations omitted). A court will presume that

the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean. *See Dumbarton*, 434 Md. at 51-52, 73 A.3d at 232; *Dennis v. Fire & Police Employees' Ret. Sys.*, 390 Md. 639, 656-57, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001); *see also, e.g.*, *Scarlett Harbor,* 109 Md. App. at 291, 674 A.2d at 142 ("Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed.").

Moreover, a court will not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." *Brendsel v. Winchester Constr. Co.*, 392 Md. 601, 623, 898 A.2d 472, 485 (2006). Indeed, "[i]t is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardship.'" *Calomiris v. Woods*, 353 Md. 425, 445, 727 A.2d 358, 368 (1999) (quoting *Canaras v. Lift Truck Servs.*, 272 Md. 337, 350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 1443 (Table), 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam) (applying West Virginia law and stating that the court "will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck.").

In a breach of contract action, "[i]t is the parties' agreement that ultimately determines whether there has been a breach." *Mathis v. Hargrove*, 166 Md. App. 286, 318-19, 888 A.2d 377, 396 (2005). Under Maryland law, the elements of a claim for breach of contract are "'contractual obligation, breach, and damages.'" *Tucker v. Specialized Loan Servicing, LLC*, 83 F. Supp. 3d 635, 655 (Bankr. D. Md. 2015) (quoting *Kumar v. Dhanda,* 198 Md. App. 337, 17 A.3d 744, 749 (2011)). To "prevail in an action for breach of contract, a plaintiff must prove that

the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001); *accord Belyakov v. Med. Sci. & Computing*, 86 F. Supp. 3d 430, 437 (D. Md. 2015); *see also RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 658, 994 A.2d 430, 442 (2010).  In other words,

In *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362, 36 A.3d 399, 416 (2012), the Maryland Court of Appeals said: "Maryland law requires that a plaintiff alleging a breach of contract 'must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.'" (citation omitted) (emphasis in *Polek*); *see also Robinson v. GEO Licensing Co., L.L.C.*, 173 F. Supp. 2d 419, 423 (D. Md. 2001).

In Count II, Neal contends that "PenFed wrongfully withdrew funds" from Neal's deposit accounts, and that "there was [no] disclosure by PenFed that plaintiff's future disability benefits would be taken from her deposit account to pay any delinquencies."  ECF 13, ¶¶ 93-94.  Further, she asserts: "At the time of signing the loan agreement, plaintiff knew and believed that the agreement would not affect any veterans disability benefits she would receive in the future."  *Id.* ¶ 90.  PenFed, she argues, "intentionally knew that if they informed plaintiff…that [her] veterans disability benefits would be taken in the future, plaintiff . . . would decline and take [her] business to another credit union."  *Id.* ¶ 91.

Conversely, PenFed maintains that "Neal's subjective beliefs about the terms of her agreements with PenFed are irrelevant."  ECF 16 at 8.  In addition, PenFed argues that the contracts at issue—the Promissory Note, the Membership Agreement, and the Cardholder Agreement—expressly authorize it to take statutorily protected funds without notice.  *Id.*  And,

according to the contracts' express terms, PenFed asserts that it "could not have breached the contracts by taking statutorily protected benefits." *Id.*

Indeed, Neal's subjective beliefs about the terms of the agreements do not inform my analysis here. *See Dumbarton*, 434 Md. at 51, 73 A.3d at 232 (In construing an unambiguous contract, "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, *irrespective of the intent of the parties* at the time they entered into the contract . . ."). But, as discussed, *supra*, at this juncture I cannot consider the terms of the contracts at issue. Indeed, I must accept, as true, Neal's factual allegations as to the terms of the contracts. *See E.I. du Pont de Nemours & Co.*, 637 F.3d at 440.

Therefore, I shall deny PenFed's Motion with respect to Count II.

## C.     Count III: Negligence

Neal asserts a negligence claim against PenFed. She contends that her loan agreement with PenFed "created a duty to treat plaintiff . . . fairly and in good faith." ECF 13, ¶ 98. Specifically, she claims that "PenFed owed a duty to Plaintiff . . . to inform [her] that in the event of default [her] veterans disability benefits would be taken from [her] deposit accounts . . . ." *Id.* ¶ 99. According to Neal, PenFed breached this duty by "making misrepresentations regarding the nature of the way [she] would recover payment in the event of a default on a loan issued to plaintiff." *Id.* ¶ 100. Further, Pen Fed failed to notify her "whenever payments were unilaterally withdrawn" from her deposit account and "omitted to inform plaintiff . . . as to what loans the withdrawal of [her] veterans disability benefits pertained to in its monthly correspondences to plaintiff . . . ." *Id.* ¶¶ 104-05.

In its Motion, PenFed argues, *inter alia*, that this claim must fail because it did not owe a tort duty to Neal (ECF 16 at 8-11), which is an "essential element" of a negligence claim under

Maryland law. *Bailey v. Deutsche Bank Trust Co.*, 13-DKC-0144, 2013 WL 2903498, *5 (D. Md. June 12, 2013); *see also Spaulding v. Wells Fargo Bank, N.A.*, 920 F. Supp. 2d 614, 620 (D. Md. 2012) (citing *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 515 A.2d 756, 758 (1986)).

In Maryland, "to assert a claim in negligence, the plaintiff must prove: '(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.'" *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 212-13, 60 A.3d 1, 10 (2013) (quoting *Lloyd v. Gen'l Motors Corp.*, 397 Md. 108, 131-32, 916 A.2d 257, 270-71 (2007)) (emphasis omitted); *accord Schultz v. Bank of Am., N.A.*, 413 Md. 15, 27, 990 A.2d 1078, 1086 (2010) ("In a negligence case, there are four elements that the plaintiff must prove to prevail: 'a duty owed to him [or her] (or to a class of which he [or she] is a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages.'") (quoting *Jacques*, *supra*, 307 Md. at 531, 515 A.2d at 758) (alterations in *Schultz*).

Under Maryland law, "the relationship between the bank and borrower is contractual, not fiduciary, in nature." *Spaulding*, 920 F. Supp. at 620 (citation omitted). It is well established that "'[t]he mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort.'" *Blondell*, 413 Md. 96, 120-21, 991 A.2d 80, 94 (2010) (quoting *Jacques*, 307 Md. at 534, 515 A.2d at 759 (1986)); *see also Mesmer v. Md. Auto. Ins. Fund*, 353 Md. 241, 252, 725 A.2d 1053, 1058 (1999) ("A contractual obligation, by itself, does not create a tort duty. Instead, the duty giving rise to a tort action must have some independent basis.").

Notably, "when the dispute is over the existence of any valid contractual obligation covering a particular matter, or where the defendant has failed to recognize or undertake any contractual obligation whatsoever, the plaintiff is ordinarily limited to a breach of contract remedy." *Mesmer*, 353 Md. at 254, 725 A.2d at 1059. In contrast, "when the defendant has proceeded on the basis that a contractual obligation exists, has undertaken that obligation, and has undertaken it in violation of the *appropriate standard of care*, . . . the plaintiff may, in some circumstances, maintain a tort action." *Id.*

PenFed maintains that special circumstances do not exist to impose any tort duties independent of the contracts at issue. ECF 16 at 8-10. To this, Neal responds: "Maryland courts have identified certain circumstances which might impose a tort duty on a bank in a lending relationship." Relying on *Parker v. Columbia Bank*, 91 Md. App. 346, 371, 604 A.2d 521, 533 (1992), Neal contends that PenFed owed her a tort duty, because PenFed "took on extra services other than providing the loans to Neal . . . ." ECF 17 at 19. Specifically, Neal argues, PenFed owes "a duty of care" to veterans, because it "offers services to veterans concerning savings, mortgages, auto-loans" and "maintains the deposit accounts of the same veterans . . . ." *Id.*

PenFed avers that Neal's reliance on *Parker* is misplaced. In that case, as PenFed points out, the Maryland Court of Special Appeals found that the "financial institution did <u>not</u> owe a tort duty to the plaintiff because 'all of the services performed by the [defendant] were services normally provided by a bank for its customer.'" ECF 18 at 19 (emphasis and insert in original) (citing *Parker*, 91 Md. App. At 534, 604 A.2d at 371-72).

I agree with PenFed. As defendant points out, the only "extra services" Neal identifies are savings accounts, mortgages, auto-loans, and deposit accounts. But, as in *Parker*, these are "services normally provided by a bank for its customer, and "[s]uch normal services . . . do not

constitute 'extra services' creating a duty of care . . . ." *Parker*, 91 Md. App. at 534, 604 A.2d at 371-72. Accordingly, no special circumstances existed to impose a duty of care on PenFed.

As such, I shall grant the Motion with respect to Neal's negligence claim.

### D.   Count IV: Negligent Misrepresentation

Neal alleges a claim of negligent misrepresentation against PenFed. Plaintiff maintains that when she "signed the loan agreement," she was "misled as a result of PenFed's vague statements in the loan agreements." ECF 13, ¶ 111. She claims that she was "not aware that [her] veterans disability benefits would be deducted were a default to happen in the future." *Id.* ¶ 110. Moreover, "PenFed never specifically stated what loan repayments the withdrawals from the deposit accounts pertained to." *Id.* ¶ 112.

Again, PenFed contends, *inter alia*, that this claim is subject to dismissal, because no special circumstances give rise to an independent tort duty, an essential element of negligent misrepresentation under Maryland law. ECF 16 at 10.

In *Lloyd*, 397 Md. at 136, 916 A.2d at 273 (quotation marks omitted), the Maryland Court of Appeals set forth the elements of a claim for negligent misrepresentation under Maryland law:

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Id.* at 136, 916 A.2d at 273 (citations and internal quotation marks omitted).

Numerous Maryland cases are to the same effect. *See*, *e.g.*, *Blondell*, 413 Md. at 119, 991 A.2d at 94; *Griesi v. Atlantic Gen'l Hosp. Corp.*, 360 Md. 1, 11, 765 A.2d 548, 553 (2000); *Valentine v. On Target*, 353 Md. 544, 549, 727 A.2d 947, 949 (1999); *BG & E v. Lane*, 338 Md. 34, 43, 656 A.2d 307, 311 (1995); *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 336-37, 439

A.2d 534, 539 (1982); *see also Heritage Oldsmobile-Imports v. Volkswagen of Am., Inc.*, 264 F.

Supp. 2d 282, 290-91 (D. Md. 2003).

As discussed, *supra*, the Amended Complaint fails to demonstrate that PenFed owed an

independent duty of care to Neal.  ECF 16 at 10.  For that reason alone, dismissal of Neal's

negligent misrepresentation claim is appropriate.

Even assuming PenFed owed such a duty, PenFed contends that it "could not have known

that Neal would probably rely on the alleged omission," (ECF 18 at 10), *i.e.*, PenFed's alleged

failure to disclose that it would withdraw veterans' benefits from Neal's deposit account in the

event of a default.  ECF 18 at 10 (citing *Bailey*, 2013 WL 2903498, at *8).  And, "[a]t the time of

signing the loan agreements," Neal admits that she "was not receiving any veterans disability

benefits."  ECF 13, ¶ 118.  As a result, PenFed maintains, it "could not possibly have guessed

that Neal would receive such benefits in the future . . . ."  ECF 18 at 10.  Accordingly, PenFed

lacked knowledge that plaintiff would rely on the alleged omission.

This argument is persuasive.  Plaintiff's Amended Complaint fails to allege facts to

support the elements of a negligent misrepresentation claim.  As such, I shall grant PenFed's

Motion as to Count IV.

### E.      Count V: Constructive Trust

Neal contends that she is "entitled to the imposition of a constructive trust containing all

assets, funds, and property derived from PenFed's wrongful acts."  ECF 13, ¶ 124.  But, as

PenFed maintains, under Maryland law "there is no such thing as a standalone cause of action for

constructive trust."  ECF 16 at 11 (citing *Chassels v. Krepps*, 235 Md. App. 1, 16, 174 A.3d 896,

904 (2017) ("Whether or not a constructive trust might be an appropriate remedy, there is no

standalone cause of action for 'constructive trust,' and the court has right to dismiss [the claim].").

Indeed, a constructive trust is "an equitable remedy, not a cause of action in and of itself." *Lyon v. Campbell*, 33 F. App'x 659, 663 (4th Cir. 2002); *see Stewart Title Guar. Co. v. Sanford Title Servs., LLC*, Civ. No. ELH-11-260, 2011 WL 2681196, at *4 (D. Md. July 8, 2011). In *Washington Suburban Sanitary Commission v. Utilities, Inc.*, 365 Md. 1, 39, 775 A.2d 1178, 1200 (2001), the Maryland Court of Appeals explained that the "'constructive trust, like its counterpart remedies "at law," is a remedy for unjust enrichment.' The remedy 'is no longer limited to misconduct cases; it redresses unjust enrichment, not wrongdoing.'" (citations omitted). In other words, a constructive trust is a "remedial request[] that depend[s] upon [the] plaintiff's substantive causes of action." *Stewart Title*, 2011 WL 2681196, at *5; *see also Alternatives Unlimited, Inc. v. New Balt. City Bd. of School Comm'rs*, 155 Md. App. 415, 460, 843 A.2d 252, 279 (2004). These include, *inter alia*, breach of contract and unjust enrichment. *Stewart Title*, 2011 WL 2681196, at *4.

A constructive trust "is the remedy employed by a court of equity to convert the holder of the legal title to property into a trustee for one who in good conscience should reap the benefits of the possession of said property." *Wimmer v. Wimmer*, 287 Md. 663, 668, 414 A.2d 1254 (1980). "[T]he constructive trust plaintiff who proves his claim . . . wins an *in personam* order that requires the defendant to transfer legal rights and title of specific property or intangibles to the plaintiff." 1 DOBBS, § 4.3(2), at 590–91; *see also De Arriz v. Klingler-De Arriz*, 179 Md. App. 458, 480, 947 A.2d 59, 71 ("'Equity declares the [constructive] trust in order that it may lay its hand on the thing and wrest it from the possession of the wrongdoer'" (citation omitted)), *cert. denied*, 405 Md. 349, 952 A.2d 225 (2008).

Accordingly, Neal's constructive trust claim is subject to dismissal.

### F. Count VI: Accounting

Neal alleges that she is "entitled to an accounting of all assets, funds, revenues, and profits received and retained by PenFed as a result of their improper actions . . ." ECF 13, ¶ 128. She claims that the "amount of damages owed to plaintiff . . . is currently unknown and cannot be ascertained without an accounting of the revenues and profits made by PenFed . . ." *Id.* ¶ 127.

In its Motion, PenFed argues, *inter alia*, that plaintiff's accounting claim is superfluous as a claim rarely recognized under Maryland law. ECF 16 at 11. Relying exclusively on non-Maryland law, Neal responds that the "court should allow for . . . discovery to proceed and for PenFed to provide accounting as Neal . . . [has] an established right to an accounting." ECF 17 at 27.

Although an independent cause of action for accounting has not been entirely abolished in Maryland, it is no longer necessary in most cases and is rarely recognized. In *1899 Holdings, LLC v. 1899 Ltd. Liability Co.*, CCB-12-297, 2013 WL 142303, at *4 (D. Md. 2013), Judge Blake said: "[A] demand for an accounting is generally not an independent cause of action in Maryland but rather a remedy to another cause of action. If the court dismisses all other causes of action upon which a claim for an accounting could depend, then a claim for accounting should also be dismissed. An accounting may be available to a plaintiff, however, in conjunction with another valid cause of action or in limited exceptional circumstances." (citations omitted and alteration added). *See West v. Koehler*, RDB-11-3051, 2012 WL 868657, at *7 (D. Md. 2012) (noting that "a claim for accounting is not cognizable as an independent cause of action"); *Alternatives Unlimited*, 155 Md. App. at 510–11, 843 A.2d at 307–08 (observing that the equitable claim for an accounting "has been superseded by modern discovery rules"). Therefore,

"[a]n equitable accounting will not lie until the plaintiff establishes a right to maintain an action, by establishing an underlying liability that gives rise to the duty to account." 1.A. C.J.S. Accounting § 6 (2007).

In *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 36 A.3d 399 (2012), the Maryland Court of Appeals stated: "In Maryland, a claim for an accounting is available when 'one party is under [an] obligation to pay money to another based on facts and records that are known and kept exclusively by the party to whom the obligation is owed, or where there is a [confidential or] fiduciary relationship between the parties . . . .'" *Id.* at 365, 36 A.2d at 418 (quoting *P.V. Props., Inc. v. Rock Creek Village Assocs. Ltd. P'ship*, 77 Md. App. 77, 89, 549 A.2d 403, 409 (1988)) (alteration to restore accurate quotation of *P.V. Properties*); *see also Ahmad v. Eastpines Terrace Apts., Inc.*, 200 Md. App. 362, 378, 28 A.3d 1, 10, *cert. denied*, 424 Md. 55, 33 A.3d 982 (2011).

As the Maryland Court of Special Appeals recognized in *Alternatives Unlimited*, 155 Md. App. at 510, 843 A.2d at 307-08, "whereas an equitable claim for an accounting once served a necessary discovery function, that function has been superseded by modern rules of discovery" in the ordinary run of cases. "Because the relief sought in an accounting claim is access to information, discovery is the remedy given to plaintiffs who prove they are entitled to an accounting." *See Goldstein v. FDIC*, 11-cv-1604 *Golub ex rel. Golub v. Cohen*, 138 Md. App. 508, 523, 772 A.2d 880, 889 (2001). In short, when a plaintiff properly pleads another cause of action that will entitle the plaintiff to discovery, the remedy of accounting is generally superfluous.

I agree with PenFed that Neal's claim for an accounting is superfluous. None of the circumstances set forth in *Polek* are present here. Although Neal alleges that PenFed improperly

seized her veterans' benefits, Neal has not provided a sufficient basis for an accounting in lieu of discovery. In addition, the pleadings do not establish that a fiduciary relationship exists between Neal and PenFed. As discussed, *infra*, it is well established that, absent special circumstances, "the relationship between the bank and borrower is contractual, not fiduciary, in nature." *Spaulding*, 920 F. Supp. at 620 (citation omitted); *see also Silver Hill Station Ltd. P'ship v. HAS/Wexford Bancgroup, LLC*, 158 F. Supp. 2d 631, 642-43 (D. Md. 2001) ("For a fiduciary duty to exist, special circumstances over and above any contractual obligations' must exist." (quotation marks and citation omitted)).

Accordingly, there is no basis for an accounting at this juncture. As such, this claim is subject to dismissal.

### G.  Count VII: Unjust Enrichment

As to Count VII, Neal asserts that PenFed "has unjustly enriched itself by arbitrarily using the Plaintiffs [sic] . . . monthly Veterans disability benefits to repay itself." ECF 13, ¶ 130. PenFed argues that Neal's unjust enrichment claim must fail because an express contract governs the subject matter of her claim. ECF 16 at 12. In her Opposition, Neal concedes that the Promissory Note "provided for the payment in case of loan default payment." ECF 17 at 27. But, she emphasizes that the agreement "did not address the specific future veteran disability benefits and therefore the contract did not speak to this particular situation." *Id*.

Unjust enrichment is a quasi-contractual cause of action that is a remedy "to provide relief for a plaintiff when an enforceable contract does not exist but fairness dictates that the plaintiff receive compensation for services provided." *Dashiell & Sons*, 358 Md. At 97, 747 A.2d at 607. "The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim

rests." *Id.* at 96, 747 A.2d at 607; *see also FLF, Inc. v. World Publications, Inc.*, 999 F.Supp. 640, 642 (1998) ("It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties.").

In this case, Neal acknowledges that an agreement was made, but claims that the terms of the agreement do not cover the same subject matter on which her claim rests: namely, the seizure of veterans' disability benefits. ECF 17 at 27. As discussed, I may not consider the agreement as evidence at this juncture. Without the agreement, there is no way to determine whether the agreement's terms pertain to the same subject matter as Neal's claim. Therefore, in drawing all reasonable inferences in plaintiff's favor, it is appropriate to explore Neal's unjust enrichment claim.

Under Maryland law, a plaintiff's claim for unjust enrichment must satisfy the following three elements:

> "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value."

*Swedish Civil Aviation Admin. v. Project Mgmt. Enter., Inc.*, 190 F. Supp. 2d 785, 792-93 (D. Md. 2002) (quoting *Abt Associates v. JHPIEGO*, 104 F. Supp. 2d 523, 535 (D. Md. 2000)); *see Dashiell & Sons*, 358 Md. at 95-96 n.7, 747 A.2d at 607 n.7 (same); *Everhart v. Miles*, 47 Md. App. 131, 136, 422 A.2d 28, 31 (1980) (same).

"A successful unjust enrichment claim serves to 'deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits quite honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses.'" *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295, 936 A.2d

343, 352 (2007) (citation omitted). "'A person who receives a benefit by reason of an infringement of another person's interest, or of loss suffered by the other, owes restitution to him in the manner and amount necessary to prevent unjust enrichment.'" *Bank of Am. Corp. v. Gibbons*, 173 Md. App. 261, 267, 918 A.2d 565, 569 (2007).

Indeed, "[r]estitution involves the disgorgement of unjust enrichment." *Consumer Prot. Div. v. Morgan*, 387 Md. 125, 168, 874 A.2d 919, 944 (2005). They "'are simply flip sides of the same coin.'" *Bank of Am. Corp.*, 173 Md. App. at 267, 918 A.2d at 569 (citation omitted). "The purpose of restitution, therefore 'is to prevent the defendant's unjust enrichment by recapturing the gains the defendant secured in a transaction.'" *Id.* at 268, 918 A.2d at 569 (citation omitted). An unjust enrichment claim, then, "'requires restitution to the plaintiff of something that came into defendant's hands but belongs to the plaintiff in some sense.'" *Id.* at 271, 918 A.2d at 571.

Here, PenFed argues that it was not unjustly enriched by the transactions at issue because Neal already owed PenFed the amount that was seized from her deposit account. ECF 18 at 11. As PenFed points out, the Amended Complaint "expressly concedes that Neal owed PenFed $19.158.42; that she 'ended up defaulting on her monthly payments;' and that PenFed used the funds at issue to cover the loan payments she missed." *Id.* at 12 (citing ECF 13 ¶¶ 18-19, 21, 24-25, 27, 29, 31-33).

I agree with PenFed that Neal's Amended Complaint does not adequately allege the necessary elements of unjust enrichment. The seizure of Neal's funds cannot be characterized as a benefit conferred upon defendant. As such, Neal has failed to state a claim for unjust enrichment. Dismissal is appropriate.

## H.    Count VIII: Conversion

Dismissal of Neal's conversion claim is also warranted.  The Amended Complaint asserts that PenFed converted Neal's veterans' disability benefits, which was "comprised of specific, segregated, or identifiable funds under Maryland law."  ECF 13, ¶ 137.

"Conversion is an intentional tort, consisting of two elements, a physical act combined with a certain state of mind."  *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 261, 841 A.2d 828, 835 (2004).  "The physical act can be summarized as 'any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it.'"  *Id.* (citations omitted).  The requisite intent is "an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights."  *Keys v. Chrysler Credit Corp.*, 303 Md. 397, 414, 494 A.2d 200, 208 (1985).  "The defendant may have the requisite intent even though he or she acted in good faith and lacked any consciousness of wrongdoing, as long as there was an intent to exert control over the property."  *Darcars*, 379 Md. at 262, 841 A.2d at 836.

As defendant correctly observes, the general rule is that "monies are intangible, and therefore, not subject to a claim for conversion.  *Allied Inv. Corp. v. Jasen*, 354 Md. 547, 565, 731 A.2d 957, 966 (1999).  But, notwithstanding the general rule, "Maryland Courts do recognize a narrow exception for those circumstances in which the 'plaintiff can allege that the defendant converted specific segregated or identifiable funds.'"  *Hobbs v. St. Martin*, JKB-16-749, 198 F. Supp. 3d 530, 538 (D. Md. 2016) (citation omitted).

In *Gibbons v. Bank of Am. Corp.*, JFM-08-3511, 2012 WL 94569, at *9 (D. Md. 2012), Judge Motz of this Court said:

> This exception is recognized with funds that have been or should have been
> segregated for a particular purpose or that have been wrongfully obtained or

retained or diverted in an identifiable transaction. Such claims are defeated, however, if a defendant retains possession of the funds and commingles them with other monies, because the money "loses its specific identity and may no longer be the subject of a conversion action."

(Citations omitted). Relying on *Hobbs*, PenFed asserts that the narrow exception is not applicable here. According to PenFed, Neal merely "allege[s] in conclusory fashion that the funds at issue were 'specific, segregated, or identifiable funds under Maryland law.'" ECF 16 at 13 (citing ECF 13, ¶ 137).

In *Hobbs*, the plaintiff conclusorily asserted, in support of his conversion claim, that "Defendant knowingly and intentionally separately retained [the funds at issue] to the detriment of Plaintiff, the rightful owner." *Hobbs*, 198 F. Supp. 3d at 538 (quotation marks and citation omitted). Judge Bredar found that the plaintiff's vague allegations "d[id] not give rise to a plausible inference that Defendant deposited and maintained the loan funds in a distinct, segregated account." *Id.* Absent such factual allegations, Judge Bredar "infer[red] that Defendant commingled the loan proceeds with his personal funds and thereafter spent at least some portion of the commingled funds—defeating Plaintiff's conversion claim." *Id.*

The same analysis applies here. Neal does not allege that the funds were maintained in a separate account. Her conclusory allegation that PenFed converted her disability benefits as "specific, segregated, or identifiable funds" does not give rise to a plausible inference that PenFed maintained the funds in a distinct account. For this reason, Neal's conversion claim is subject to dismissal.

## I.        Count IX: EFTA

Neal contends that PenFed violated the EFTA, 15 U.S.C. §§ 1693 *et seq.*, and its implementing regulation, 12 C.F.R. § 1005.10, *et seq.* ("Regulation E"). Specifically, she asserts that PenFed electronically transferred funds from her deposit account without proper

preauthorization. ECF 13, ¶ 143. PenFed argues, *inter alia*, that this claim should be dismissed because the "EFTA does not apply to the transactions at issue." ECF 16 at 14.

In 1978, Congress enacted the EFTA as part of the comprehensive Consumer Credit Protection Act ("CCPA"), codified as amended at 15 U.S.C. § 1601 *et seq. See Clemmer v. Key Bank Nat.* Ass'n, 539 F.3d 349, 350 (6th Cir. 2008). The EFTA was enacted "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." 15 U.S.C. § 1693(b).

The EFTA states, in relevant part: "A preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer *only in writing*, and a copy of such authorization shall be provided to the consumer when made." *Id*. § 1693e(a) (emphasis added). The Act defines a "preauthorized electronic fund transfer" as an "electronic fund transfer authorized in advance to recur at substantially regular intervals." *Id*. § 1693a(10); 12 C.F.R. § 1005.2(k).

Regulation E provides that, in general, § 1693(a) applies "to any electronic fund transfer that authorizes a financial institution to debit or credit a consumer's account." 12 C.F.R. 1005.3(a). However, the following is excluded from coverage:

(c) Exclusions from coverage. The term "electronic fund transfer" does not include: . . . .

(5) Automatic transfers by account-holding institution. Any transfer of funds under an agreement between a consumer and a financial institution which provides that the institution will initiate individual transfers without a specific request from the consumer:

i) Between a consumer's accounts within the financial institution;
ii) From a consumer's account to an account of a member of the consumer's family held in the same financial institution; or
iii) Between a consumer's account and an account of the financial institution, except that these transfers remain subject to § 1005.10(e) regarding compulsory use and sections 916 and 917 of the Act regarding civil and criminal liability.

*Id.* § 1005.3(c)(5).

In her Amended Complaint, Neal insists that PenFed violated § 1693e(a) because "Neal was never provided a copy of any authorization" that stated PenFed "would take her veterans disability benefits incase [sic] of a default in loan repayment." ECF 13, ¶ 144. Further, she asserts that "PenFed never made it clear and readily identifiable in its loan agreements to the veteran plaintiff" that her "veterans disability benefits would be transferred from" her deposit account. *Id.* ¶ 147. In addition, she claims that in July 2017 she complained to PenFed "that her veterans disability benefits had been transferred in error . . . ." *Id.* ¶ 148. And, in response to Neal's complaint, PenFed did not "make a good faith investigation of the alleged error . . . ." *Id.* ¶ 149.

PenFed argues that the transactions at issue fall within the exception laid out in 12 C.F.R. § 1005.3(c)(5)(iii), involving automatic transfers "between a consumer's account and an account of the financial institution." ECF 16 at 14-15; ECF 18 at 13. According to PenFed, Neal was provided a copy of, and in fact signed, the Promissory Note, which preauthorized the transactions. *Id.* And, even assuming the transactions are covered under the EFTA, PenFed contends that the Promissory Note provided adequate notice of the transactions. *Id.* at 15.

PenFed's contentions hinge on whether the Promissory Note preauthorized the transfers between Neal's deposit account and an account of PenFed. And, as indicated, I may not consider the Promissory Note as evidence at this stage. Therefore, I must deny PenFed's Motion as to Neal's EFTA claim.

### J.    Count X: TILA

Neal alleges that PenFed violated TILA by "fail[ing] to make meaningful disclosure of credit and loan terms and using Plaintiff's veteran's benefits to pay for loan delinquencies on her

loan accounts." ECF 13, ¶ 155. PenFed asserts that this claim fails for two reasons: (1) it is time-barred because Neal did not file suit until more than a year after the loan was issued; and (2) the Amended Complaint fails to state a claim for relief under the TILA. ECF 16 at 16-17; ECF 18 at 13.

TILA, 15 U.S.C. §§ 1601, *et seq.*, was passed in 1968 to "'assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit.'" *Mourning v. Family Publications Serv., Inc.,* 411 U.S. 356, 364–65 (1973) (quoting 15 U.S.C. § 1601(a)). More recently, Congress passed the Helping Families Save Their Homes Act of 2009, Pub.L. No. 111–22, 123 Stat. 1632, which amended various sections of TILA.

Among other things, TILA "requires lenders 'clearly and conspicuously' to make a number of disclosures to borrowers, including the disclosure of the borrowers' right to rescind a consumer credit transaction." *Watkins v. SunTrust Mortg., Inc.,* 663 F.3d 232, 234 (4th Cir.2011) (quoting 15 U.S.C. §§ 1601(a)). Creditors are also required "to provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights." *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998); *see generally* 15 U.S.C. §§ 1601-1667f.

TILA's disclosure requirements apply only to creditors and their assignees. In particular, "[t]he only parties who can be liable for [TILA] violations are the original creditor, 15 U.S.C. § 1640, and assignees of that creditor, 15 U.S.C. § 1641." *Chow v. Aegis Mortg. Corp.,* 286 F.Supp.2d 956, 959 (N.D. Ill. 2003).

Section 1640 of TILA authorizes a civil action for damages against "any creditor who fails to comply with any requirement imposed under" §§ 1631–1651 and 1666–1667f (*i.e.,* Parts

B, D, and E of the TILA).  However, § 1640(e) provides, with exceptions not relevant here, that an "action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, *within one year from the date of the occurrence of the violation . . . .*" (emphasis added).  The "date of the occurrence of the violation' is the date on which the borrower accepts the creditor's extension of credit."  *Brown v. Ocwen Loan Servicing, LLC*, PJM-14-3454, 2015 WL 5008763, at *7 (D. Md. Aug. 20, 2015) (internal quotation marks and citation omitted), *aff'd*, 639 F. App'x 200 (4th Cir. 2016).

PenFed maintains that the one-year limitations period has lapsed.  Defendant claims that the date of the occurrence of the alleged violation was May 27, 2015, when Neal signed the Promissory Note.  ECF 16 at 16.  And, it is undisputed that Neal did not file suit until February 13, 2018–more than two years later.  *See* ECF 1.

In her Response, Neal argues that equitable tolling applies here.  ECF 17 at 32-35.  According to Neal, the Promissory Note "stated that PenFed could take 'all balances' and 'all statutorily protected funds' without specifying that the veterans benefits received in the future would be taken in case of default."  *Id*. at 34.  She claims that "[t]his detail was hidden intentionally by PenFed and Neal was not notified."  *Id*.

Unlike some statutes of limitations, TILA's statute of limitations is not expressly based on when a claim "accrues." The concept of accrual is ordinarily thought to include a discovery rule, by which accrual cannot occur until the plaintiff has (or should have) "possession of the critical facts that he has been hurt and who has inflicted the injury." *United States v. Kubrick,* 444 U.S. 111, 122 (1979) (discussing discovery rule in the context of the Federal Tort Claims Act, which contains a statute of limitations requiring notice to the government "within two years

after such claim accrues").  As noted, TILA's limitations provision begins to run on the "date of the occurrence of the violation." 15 U.S.C. § 1640(e).

However, several courts, including courts in this district, have held that the equitable doctrine of fraudulent concealment may toll the statute of limitations for claims under TILA to recover monetary damages. *See Elman v. JP Morgan Chase Bank, NA,* PJM-10-31, 2010 WL 2813351, at * 2 (D. Md. July 13, 2010); *Kerby v. Mortg. Funding Corp.,* 992 F. Supp. 787, 798 (D. Md. 1998) (concluding that the doctrine of fraudulent concealment can toll the statute of limitations established in 15 U.S.C. § 1640(e) for monetary damages claims under TILA); *see also Stephens v. Bank of Am. Home Loans, Inc.,* No. 5:16-CV-660-F, 2017 WL 384315, at *5 (E.D.N.C. Jan. 25, 2017) (identifying three different federal appellate courts that have held that the statute of limitations for monetary damages under TILA is subject to equitable tolling); *Espejo v. George Mason Mortg., LLC,* 1:09-CV-1295 (JCC), 2010 WL 447009, at *6 (E.D. Va. Feb. 2, 2010) (identifying four different federal appellate courts that have held that the statute of limitations for monetary damages under TILA is subject to equitable tolling).

The Court of Appeals for the Fourth Circuit has explained that "the fraudulent concealment doctrine tolls the statute of limitations 'until the plaintiff in the exercise of reasonable diligence discovered or should have discovered the alleged fraud or concealment.'" *Browning v. Tiger's Eye Benefits Consulting,* 313 F. App'x 656, 663 (4th Cir. 2009) (citation omitted). In order to justify equitable tolling on the basis of fraudulent concealment, a plaintiff must prove "(i) that the party asserting the statute of limitations concealed facts that are the basis of the plaintiff's claim; (ii) that the plaintiff failed to discover those facts within the statutory period; and (iii) that the plaintiff failed to do so despite the exercise of due diligence." *Roach v.*

*Option One Mortg. Corp.,* 598 F. Supp. 2d 741, 751–52 (E.D. Va. 2009) (internal quotation marks and alteration omitted), *aff'd,* 332 F. App'x 113 (4th Cir. 2009).

The late Judge Frank Kaufman aptly explained in *Davis v. Edgemere Fin. Co.*, 523 F. Supp. 1121, 1126 (D. Md.1981):

> Application of the fraudulent concealment doctrine in the context of the disclosure requirements of the TILA requires more than mere nondisclosure.... Otherwise, in a context in which nondisclosure is the gravamen of the violation, then just about every failure by defendant to disclose as required by the TILA would seemingly bring about tolling and would tend to eviscerate the limitations provision set forth in § 1640(e)....

I am not persuaded that the equitable tolling doctrine applies here. To be sure, I am unable to consider the terms of the Promissory Note. But, based on plaintiff's pleadings, there is no indication that PenFed took any action to fraudulently conceal their alleged failure to make disclosures required under the TILA. *See Wiseman v. First Mariner Bank*, ELH-12-2423, 2013 WL 5375248, at *27 (D. Md. Sept. 23, 2013) (concluding, in the context of a Rule 12(c) motion for failure to state a claim, that plaintiff's TILA claims were time-barred and equitable tolling did not apply where there was 'no indication that the . . . Defendants took any action to fraudulently conceal their alleged failure to make disclosures required under the TILA."). Accordingly, I conclude that plaintiff's TILA claim is time-barred and shall be dismissed.

PenFed also argues that this claim is subject to dismissal for failure to state a claim. ECF 16 at 16. Specifically, defendant contends: "Neal's allegations that PenFed failed to disclose information about the terms of the loans and about the specific transactions at issue are directly contradicted by the very documents she references and relies upon in the complaint." *Id.* Because I conclude that Neal's TILA claim is time-barred, I need not reach this contention.

### K.    Count XI: MCPA

Finally, Neal alleges that PenFed violated the MCPA.  ECF 13, ¶ 164-76.  The MCPA is "intended to provide minimum standards for the protection of consumers in the State."  C.L. § 13-303(a); *see also Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 140, 916 A.2d 257, 276 (2007). It is liberally construed in order to achieve its consumer protection objectives.  *Marchese v. JPMorgan Chase Bank, N.A.*, 917 F. Supp. 2d 452, 465 (D. Md. 2013) (citing *State v. Cottman Transmissions Sys., Inc.,* 86 Md. App. 714, 587 A.2d 1190, 1204 (1991)).

Among other things, it is unlawful under the MCPA for a person to use unfair or deceptive trade practices related to the extension of consumer credit or the collection of consumer debts.  C.L. § 13-301; *see Piotrowski v. Wells Fargo Bank, N.A.*, DKC-11-3758, 2013 WL 247549, at *10 (D. Md. Jan. 22, 2013).  C.L. § 13-301(1) defines unfair or deceptive trade practices as, *inter alia*: (1) "False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;" and (2) "Failure to state a material fact if the failure deceives or tends to deceive."  *See Marshall v. James B. Nutter & Co.*, 816 F. Supp. 2d 259, 266 (D. Md. 2011) (explaining that "the MCPA prohibits both the use of false or misleading statements and also the omission of material facts").

For both material misrepresentation and material omission claims under the MCPA, a party must prove reliance. *Bezmenova v. Ocwen Fin. Corp.*, AW-13-003-AW, 2013 WL 3863948, at *5 (D. Md. July 23, 2013); *see also Bank of Am., N.A. v. Jill P. Mitchell Living Trust*, 822 F. Supp. 2d 505, 533 (D. Md. 2011) ("The requirement of reliance flows from the MCPA's prescription that the party's 'injury or loss' be 'the result of' the prohibited practice . . . .").  With respect to a material misrepresentation, "[a] consumer relies on a

misrepresentation when the misrepresentation substantially induces the consumer's choice." *Mitchell Living Trust*, 822 F. Supp. 2d at 533 (citations omitted). In contrast, "a consumer relies on a material omission under the MCPA where it is substantially likely that the consumer would not have made the choice in question had the commercial entity disclosed the omitted information." *Id.* at 535.

An individual bringing a private cause of action pursuant to the MCPA must establish an actual injury or loss sustained as a result of a prohibited practice. *See Marchese*, 917 F. Supp. 2d at 465; *see also Allen v. CitiMortgage, Inc.*, CCB-10-2740, 2011 WL 3425665, at *10 (D. Md. Aug. 4, 2011) (explaining that under the MCPA "an individual may only bring a claim if she can 'establish the nature of the actual injury or loss that he or she allegedly sustained as a result of the prohibited practice'" (quoting *Lloyd*, 397 Md. at 148, 916 A.2d at 280)); *Lloyd,* 397 Md. at 143, 916 A.2d at 277 (concluding that a plaintiff must demonstrate that he or she "suffered an identifiable loss, measured by the amount the consumer spent or lost as a result of his or her reliance on the sellers' misrepresentation").

Neal alleges that PenFed used unfair or deceptive trade practices under C.L. § 13-301(1), because PenFed "intentionally and willfully did not inform plaintiff" that her veterans' disability benefits would be withdrawn from her deposit accounts to repay her loan delinquency. ECF 13, ¶ 169. Further, Neal claims that PenFed "would have taken [its] business elsewhere" if plaintiff knew that her benefits would be taken out of her deposit account. *Id.* Plaintiff asserts that she "relied on . . . PenFed's misrepresentations and concealment of material facts when deciding to maintain [her] account[] with PenFed," and that "PenFed withdrew the veterans disability payments under false pretenses. *Id.* ¶ 173. Moreover, she alleges that she has "sustained an ascertainable loss as well as other damages." *Id.* ¶ 175.

In my view, Neal has not satisfactorily pleaded that PenFed misled her about the withdrawal of her benefits to cover loan payments. Significantly, plaintiff cannot base an MCPA claim on the allegation that she was damaged by paying a debt she already owed. *Willis v. Countrywide Home Loans Servicing, L.P.*, CCB-09-1455, 2009 WL 5206475, at *6 (D. Md. Dec. 23, 2009). Therefore, she "is unable to establish the necessary element of injury or loss required to bring a private claim under the [M]CPA." *Id.* As such, PenFed's Motion is granted as to Neal's MCPA claim.

## IV.    Conclusion

For the reasons stated above, I shall GRANT the Motion with respect to Count I, for violations of § 5301; Count V, for constructive trust; Count VI, for an accounting; Count VII, for unjust enrichment; Count VIII, for conversion; Count X, for violations of the TILA; Count XI, for violations of the MCPA. Otherwise, the Motion is DENIED.

An Order follows, consistent with this Memorandum Opinion.


Date: November 5, 2018                         _____/s/_____

                                               Ellen L. Hollander
                                               United States District Judge