IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TIFFANY NEAL

    *Plaintiff*,

    v.

PENTAGON FEDERAL CREDIT
UNION,

    *Defendant*.

Civil Action No. ELH-18-451

## MEMORANDUM OPINION

In this case, the Court considers whether a federal credit union was entitled to recoup approximately $3,500 in overdue loan payments from its depositor by withdrawing funds from the customer's deposit account. The funds in the account derived from "Veterans disability benefits" paid to the depositor to "compensate [her] for [her] impaired earning capacity . . . ." ECF 13, ¶ 1.

Plaintiff Tiffany Neal, a disabled veteran, filed a class action suit against Pentagon Federal Credit Union ("PenFed"), defendant. ECF 1. In a "First Amended Class Action Complaint" (ECF 13, "Amended Complaint"), Neal alleges that PenFed unlawfully withdrew disability benefits from her PenFed account to offset Neal's overdue loan payments.[1]

---

[1] Neal brings the action "on behalf of herself and all other similarly situated veterans who have deposit accounts with PenFed and have received disability benefits through these same accounts which were . . . taken to cover loan defaults." ECF 13, ¶ 4. However, Neal has not moved to certify a class. Therefore, the question of class certification is not before the Court. ECF 19 at 14; *see Lesser v. Balt. City Bd. of Sch. Comm'rs*, JKB-17-046, 2017 WL 2733938, at *2 (D. Md. June 26, 2017).

The Amended Complaint contains eleven causes of action,[2] of which two remain: "Breach of Contract" under Maryland law (Count II), and "Violation of the Electronic Funds Transfers Act ('EFTA') 15 U.S.C. § 1693 *et seq.*" (Count IX).[3]

PenFed has filed an "Amended Answer and Counterclaim." ECF 23 (the "Counterclaim").[4] The Counterclaim contains four counts: "Breach of Contract—Overdrafts" (Count I); "Breach of Contract—Credit Card" (Count II); "Breach of Contract—Personal Loan" (Count III); and "Attorney Fees" (Count IV). *Id.* ¶¶ 15-23. In sum, PenFed alleges that Neal has defaulted on her repayment obligations and owes PenFed a total of $45,102.67, plus attorney's fees and costs. *Id.* at 17.

Now pending is PenFed's pre-discovery motion for summary judgment, filed with respect to plaintiffs' claims in Counts II and IX, and as to Counts I through III of the Counterclaim. ECF 24 (the "Motion"). The Motion is supported by several exhibits. ECF 24-2 – ECF 24-11. These include the Declaration of John Dorn (ECF 24-2, "Dorn Declaration"), who is employed by PenFed as Vice President of Collections. *Id.* ¶ 3. Dorn attests that as a result of his position, he has access "to PenFed's files related to accounts" held by Neal. *Id.* ¶ 4. The files are appended as

---

[2] Neal refers to each claim as a cause of action. For convenience, I shall refer to each cause of action as a count. I note that Neal has two claims that are labeled "Tenth Cause Of Action." *See* ECF 13 at 33, 35.

[3] In a Memorandum Opinion (ECF 19) and Order (ECF 20) of November 5, 2018, I granted PenFed's motion to dismiss (ECF 16) the original Complaint with respect to Counts I, III, IV, V, VI, VII, VIII, X, and XI. But, I denied the motion as to Counts II and IX. Count I alleged "Violation of 38 U.S.C. § 5301"; Count III alleged "Negligence"; Count IV alleged "Negligent Misrepresentation"; Count V asserted "Constructive Trust"; Count VI alleged "Accounting"; Count VII alleged "Unjust Enrichment"; Count VIII alleged "Conversion"; Count X asserted "Violation of the Truth in Lending Act [('TILA')]"; and Count XI asserted "Violation of the Maryland Consumer Protection Act ('MDCPA')" (renumbered as Count XI).

[4] PenFed filed an Answer to the Amended Complaint on November 19, 2018. ECF 21. About a month later, it filed the Amended Answer and Counterclaim. ECF 23.

exhibits to Dorn's Declaration.[5]  Plaintiff opposes the Motion (ECF 29, "Opposition"), and has submitted one exhibit.  ECF 29-1 (Plaintiff's Declaration).  PenFed has replied.  ECF 30 ("Reply").

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion (ECF 24) with respect to Counts II and IX of the Amended Complaint.  And, I shall grant in part and deny in part the Motion with respect to Counts I, II, and III of the Counterclaim.

## I.      Factual Background

Neal is a 100% disabled, honorably discharged veteran of the United States Army.  ECF 13, ¶ 10.  PenFed is a "United States federal credit union headquartered in McClean, Virginia, chartered and regulated under the authority of the National Credit Union Administration."  *Id.* ¶ 11.  It provides loans, savings and deposit accounts, credit cards, and other financial services to veterans.  *Id.* ¶ 12.

In September 2002, while Neal was on active duty, she opened an account with PenFed.  ECF 29-1, ¶ 2; ECF 13, ¶ 14.  Since then, "Neal has maintained several accounts" with PenFed, including two deposit accounts.  ECF 13, ¶ 15.  One account ends in "8016," and is a "Regular Share account."  *Id.*  The other account ends in "8029" and is referred to as a "PenCheck Access" account. *Id.*

Whie Neal was on active duty, she received her wages by direct deposit to her PenFed deposit account.  ECF 29-1 (Neal Affidavit), ¶ 3.  Thereafter, Neal's Veteran disability benefits were deposited into the PenFed account ending in 8016.  ECF 13, ¶ 16.  As of June 2017, the monthly benefit was about $3,282.00.  *Id.* ¶ 23.

---

[5] PenFed labels each file as "Exhibit A-1," "Exhibit A-2," and so on.  I shall refer to each file by its ECF number.

Neal also has two loan accounts with PenFed. *Id.* ¶ 18. One is a "Signature loan account ending in 1702" and the other is "Thrifty Credit Service ending in 7776." *Id.* ¶ 18.

Plaintiff alleges that, due to "sudden health emergencies," she "ended up defaulting on her monthly payments to PenFed on the loan accounts." *Id.* ¶ 21. However, she claims that she never "[s]pecifically authorize[d] electronic funds transfer and/or assignment of her disability benefits" to defendant "in the event of a default . . . ." *Id.* ¶ 20.

When Neal opened her first account with PenFed in 2002, she signed and submitted a "Membership Application/Signature Card" to PenFed. ECF 24-3 ("Membership Application"). Above the signature line, the Membership Application stated, in pertinent part: "I hereby make application for membership in the Pentagon Federal Credit Union. I have read the attached Membership and Account Agreements and, if accepted, I agree to comply with these terms and any amendments thereto, and to subscribe to at least one share." ECF 24-3 at 3.

Significantly, the attached "Membership Disclosures" (ECF 24-4) provided, in relevant part, *id*. at 4:

> The following disclosures are applicable to all share accounts and to any individual having access to any share or loan account. These terms are subject to change upon written notice. The words "i," "me," "myself," mean each person signing the membership application/signature card including anyone who has access to the account(s).
>
> *       *       *
>
> i.   Indebtedness. Pentagon Federal is authorized, at any time, to charge against the funds in my account(s) any indebtedness or charge owing to it by any owner. If I have pledged funds in an account as security for a loan, these funds may not be withdrawn.

Neal submitted a credit card application to PenFed in May 2015 for an account with a number ending in 2135. ECF 24-2, ¶ 12; ECF 24-9 (Credit Card Data). On May 6, 2015, PenFed approved the application, with a credit limit of $14,000. ECF 24-2, ¶ 12; ECF 24-9 at 6.

Dorn avers that PenFed provided Neal with a Cardholder Agreement of an unspecified date (ECF 24-10), "pursuant to its routine practice of sending copies of all cardholder agreements and disclosure statements to all of its cardholders before they become effective."  ECF 24-2, ¶ 13.  However, Neal maintains that she never received a copy of the Cardholder Agreement.  ECF 29-1, ¶ 22.

According to defendant, the Cardholder Agreement stated, in relevant part, ECF 24-10 at 2-3 (emphasis added):

> **1. AGREEMENT.** We agree to extend credit to you and advance amounts up to your credit limit, but transaction limits may apply. . . . You agree to pay us for credit extended for the use of the Card by you or any other cardholder, along with all applicable finance charges, fees and insurance, if any apply.  By signing, using or permitting others to use the Card, you agree to the terms and conditions contained in the Agreement, on the Card, on any charge slip resulting from authorized use of the Card, on any authorized cash advance slip, and to accept responsibility for all actions taken with the Card.

*       *       *

> **7. DEFAULT.** You will be in default if you fail to make any payment on time, if you exceed the credit limit established for the Account, . . . . Subject to law, if you default on this Agreement, we can, without giving anyone notice, demand immediate payment of the remaining balance due including but not limited to any unpaid finance charges, late fees and any other charges due under this Agreement.

*       *       *

> **16. LIEN.** You hereby appoint PenFed as your agent under a special power of attorney as well as *give your express consent to enable use to charge against any balance in any of your accounts, including accounts on which you are a joint owner, to include any otherwise statutorily protected funds that may* not otherwise be available by legal process, to pay any indebtedness or other outstanding obligation owed by you or any person who is listed as a joint owner on your accounts, including a deceased joint owner. . . . *We may take such action without further notice to you or any joint owner*.  In regard to those funds that have a statutory protection, you understand that you may withdraw the special power of attorney and consent for PenFed to apply such funds to pay any such indebtedness by notifying us in writing.  If your agency appointment or consent is withdrawn, PenFed may in its sole discretion terminate any and all services that you have with the credit union.

On May 27, 2015, PenFed extended a loan to Neal in the sum of $25,000 (account number ending in 1702), for which Neal executed a Promissory Note.  ECF 24-2, ¶ 10; ECF 24-8 at 2 ("Promissory Note").[6]  Above the signature line, the Promissory Note provided, in pertinent part, ECF 24-8 at 2 (emphasis added):

> To protect you if I default on this loan I pledge all my shares, deposits, payments and dividends which may be received, whether held jointly or individually, up to the amount of my loan balance. . . . *You may take all shares needed by you to repay the loan*.  If it is necessary to take all my shares for the payment of this note I understand my membership in the credit union may end.  *I agree that PenFed has the right pursuant to its statutory lien and further, I give my express consent to enable PenFed to charge against any balance in any of my PenFed accounts, including accounts on which I am a joint owner, to include any otherwise statutorily protected funds that may not otherwise be available by legal process, to liquidate* any PenFed indebtedness or other outstanding financial obligation owed by me or any person who is listed as a joint owner on my accounts, including a deceased joint owner.  *PenFed may take such action without further notice to me or any joint owner*.  In regard to those funds that have a statutory protection I understand that I may withdraw my express consent for PenFed to apply such funds to any such indebtedness by notifying PenFed in writing.  If my consent is withdrawn, PenFed may in its sole discretion terminate any and all services that I have with the credit union.
> DEFAULT.  I will be in default if I fail to pay any installment on time, . . . Subject to law, if I default on this note you can demand immediate payment of the remaining

---

[6] Except for the Promissory Note, plaintiff "objects to the authenticity of the other purported written agreements because they are not signed by her and [allegedly] were never provided to her . . . ."  ECF 29 at 21.  "It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment."  *Orsi v. Kirkwood*, 999 F.2d 86, 92 (1993).  But, "[i]t is clear that evidence not in a form admissible may nonetheless be considered in summary judgment."  *Tillery v. Borden*, CBD-07-1092, 2010 WL 2132226, at *4 (D. Md. May 25, 2010) (internal citation omitted).

In this case, PenFed has submitted the Dorn Declaration (ECF 24-1), in which Dorn attests to the authenticity of the agreements attached to the Motion.  An affidavit is a permissible form of authentication at summary judgment.  *Orsi*, 999 F.2d at 92 (observing that "to be admissible at the summary judgment stage, 'documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e)'") (internal citation omitted).

For the reasons stated by Pen Fed (*see*, *e.g.*, ECF 30 at 5), I may consider the agreements attached to PenFed's Motion (ECF 24-3 – ECF 24-6; ECF 24-10).

balance due on this note without giving anyone notice.  You may also use any of your other legal rights. . . .

Neal acknowledges that "the signature on the Promissory [N]ote is [her] signature."  ECF 29-1, ¶ 18.  But, she states that "without being provided a copy of [her] loan agreements," she does "not recall if it was the actual agreement that [she] signed."  *Id.*

John Dorn, defendant's Vice President of Collections, avers that prior to January 2017, PenFed provided Neal with an updated version of the Membership Disclosures, effective in January 2017.  ECF 24-2, ¶ 7; ECH 24-5 (January 2017 Membership Disclosures).[7]  The January 2017 Membership Disclosures included, *inter alia*, the following provision, ECF 24-5 at 10-11 (emphasis in original):

STATUTORY LIEN AGREEMENT

My account agreements with PenFed include a provision that allows PenFed to apply funds I have available in any of my PenFed accounts to offset indebtedness I have incurred to PenFed.  This provision has not been applicable in the past nor is it applicable in the future to my individual retirement accounts (IRA).  PenFed is therefore clarifying the provision, as highlighted below, to read as follows.

STATUTORY LIEN.  I agree that PenFed has the right pursuant to its statutory lien and further, I hereby appoint PenFed as my agent under a special power of attorney as well as give my express consent to enable PenFed to charge against any balance in any of my accounts, including accounts on which I am a joint owner, to include any otherwise statutorily protected funds that may not otherwise be available by legal process, to pay any indebtedness or other outstanding financial obligation owed by me or any person who is listed as a joint owner on my accounts, including a deceased joint owner.  **This provision does not include my individual retirement account (IRA) or any other account for which this provision is not permitted under Internal Revenue Code.**  PenFed may take such action without further notice to me or any joint owner.  In regard to those funds that have a statutory protection, I understand that I may withdraw the special power of attorney and consent for PenFed to apply such funds to pay any such indebtedness by notifying

---

[7] Dorn attests that ECF 24-5 "is a true and correct copy of the version of the membership disclosures and accounts agreements that were in effect in June and July of 2017, and which PenFed had previously provided to Neal pursuant to its routine business practice of sending copies of all current membership disclosures and accounts agreements to all of its members before they become effective."  The updated Membership Disclosures list "January 2017" as the effective date.

PenFed in writing. If my agency appointment or consent is withdrawn, PenFed may in its sole discretion terminate any and all services that I have with the credit union.

In addition, the January 2017 Membership Disclosures stated, ECF 24-5 at 23, 26:

2. I agree that PenFed has the right pursuant to its statutory lien and further, I give my express consent to enable PenFed to charge against any balance in any of my PenFed accounts, including accounts on which I am a joint owner, to include any otherwise statutorily protected funds that may not otherwise be available by legal process, to liquidate any PenFed indebtedness, owed by me or any person who is listed as a joint owner on my accounts with PenFed, including a deceased joint owner. This provision does not include my IRA account or any other account for which this provision is not permitted under Internal Revenue Code. PenFed may take such action without further notice to me or any joint owner. In regard to those funds that have a statutory protection I understand that I may withdraw my express consent for PenFed to apply such funds to pay any such indebtedness by notifying PenFed in writing. If my consent is withdrawn, PenFed may in its sole discretion terminate any and all services that I have with the credit union.

*        *        *

8. Periodic statements will be sent by PenFed to me at the last address or in accordance with the last instructions I have given in writing. I agree to keep PenFed informed of my current address. I will carefully review the statement. Any objection which I may have regarding an item or any unauthorized debit or transaction shown on a periodic statement of this account shall be waived unless it is made orally or in writing to PenFed before the expiration of 60 days after the statement has been mailed or transmitted. If the objection is made orally, PenFed may also require me to provide it in writing within ten (10) business days.

Moreover, Dorn asserts that prior to August 2017 PenFed provided Neal with yet another version of the Membership Disclosures, effective August 2017 (ECF 24-6), "pursuant to its routine business practice of sending copies of all current membership disclosure and accounts agreements to all of its members before they became effective." ECF 24-2, ¶ 8. The August 2017 Membership Disclosures provided, in relevant part, ECF 24-6 at 10-11:

**STATUTORY LIEN AGREEMENT**

My account agreements with PenFed include a provision that allows PenFed to apply funds I have available in any of my PenFed accounts to offset indebtedness I have incurred to PenFed. . . .

**STATUTORY LIEN.**  I agree that PenFed has the right pursuant to its statutory lien and further, I hereby appoint PenFed as my agent under a special power of attorney as well as give my express consent to enable PenFed to charge against any balance in any of my accounts, including accounts on which I am a joint owner, to include any otherwise statutorily protected funds that may not otherwise be available by legal process, to pay any indebtedness or other outstanding financial obligation owed by me or any person who is listed as a joint owner. . . . PenFed may take such action without further notice to me or any joint owner.  In regard to those funds that have a statutory protection, I understand that I may withdraw the special power of attorney and consent for PenFed to apply such funds to pay any such indebtedness by notifying PenFed in writing. . . .

The August 2017 Membership Disclosures also included the following provisions, *id*. at

24, 27:

2. I agree that PenFed has the right pursuant to its statutory lien and further, I give my express consent to enable PenFed to charge against any balance in any of my PenFed accounts, including accounts on which I am a joint owner, to include any otherwise statutorily protected funds that may not otherwise be available by legal process, to liquidate any PenFed indebtedness, owed by me or any person who is listed as a joint owner on my accounts with PenFed, including a deceased joint owner. . . PenFed may take such action without further notice to me or any joint owner.  In regard to those funds that have a statutory protection I understand that I may withdraw my express consent for PenFed to apply such funds to pay any such indebtedness by notifying PenFed in writing.  If my consent is withdrawn, PenFed may in its sole discretion terminate any and all services that I have with the credit union.

\*       \*       \*

7. Periodic statements will be sent by PenFed to me at the last address or in accordance with the last instructions I have given in writing.  I agree to keep PenFed informed of my current address.  I will carefully review the statement.  Any objection which I may have regarding an item or any unauthorized debit or transaction shown on a periodic statement of this account shall be waived unless it is made orally or in writing to PenFed before the expiration of 60 days after the statement has been mailed or transmitted.  If the objection is made orally, PenFed may also require me to provide it in writing within ten (10) business days.

As indicated, Neal maintains that she never received or signed "updated copies" of the

Membership Disclosures.  ECF 29-5, ¶¶ 5, 22.   However, at the very least, she would have seen

the original Membership Disclosures, because she signed the credit union application indicating that she read the terms. *See* ECF 24-3.

It is undisputed that Neal defaulted on her loan repayments to PenFed. As a result, PenFed initiated seven transactions by which it took funds from Neal's deposit account (Regular Share Account No. 8016) to offset Neal's past due loan amounts and related charges. In particular, PenFed transferred the following amounts: $49.66 and $559.26 on July 4, 2017; $550.65 on August 2, 2017; $552.03 on September 2, 2017; $1,124.00 on September 28, 2017; and $59.05 and $551.59 on October 3, 2017. ECF 16-4 at 3-14. The monies, totaling $3,453.47, were credited to Neal's Thrifty Credit Service Account, No. 7776; her Personal Loan, Account No. 1702; and her Credit Card, Account No. 2135. *See* ECF 24-2, ¶¶ 9, 14; ECF 24-7; ECF 24-11.

Neal did not object to the transactions within 60 days of issuance of the relevant monthly statements. ECF 24 at 8. In July 2017, Neal attempted to submit a payment on her home mortgage using her PenFed deposit account ending in 8016. ECF 29-1, ¶ 8. She "was informed by the mortgage bank that there were insufficient funds" even though her "veterans disability benefits had just been sent to [her] deposit account by the veterans benefits administration on June 28, 2017." *Id*. ¶ 9. According to Neal, only then did she learn that PenFed had "transferred veterans disability benefits from [her] deposit account to cover for loan delinquencies in . . . another account [she] had with PenFed." *Id*. ¶ 10. And, in July 2017, Neal "objected to any further transfer of [her] veterans disability benefits by PenFed to cover for the loan delinquencies," but PenFed "told [her] there is nothing that [it] could do to stop it because [she] owed the money." *Id*. ¶ 11.

Neal asserts: "PenFed did not provide me [with a] written explanation for why they had transferred my veterans disability benefits without authorization and as to why they continued to make the unauthorized transfers of my veterans disability benefits." *Id*. ¶ 23. According to Neal,

PenFed informed her that she "had insurance on [her] credit card to cover any late payments" and that it would send her "a form to fill in order to be able to utilize the insurance function." *Id.* ¶ 26. However, it never sent her the form. *Id.*

Dorn avers that PenFed provided bank statements for Neal's deposit accounts "on a monthly basis between June and October 2017 pursuant to its routine practice of sending monthly statements to all of its members." ECF 24-2, ¶ 9; ECF 16-4 (Bank Statements of June 25, 2017, through October 25, 2017). Neal states that PenFed initially sent her "paper copies of [her] monthly statements until later on when [PenFed] stopped sending [her] paper statements via mail." ECF 29-1, ¶ 6. But, Neal claims that she does "not use online banking and thus would check [her] bank account whenever [she] walked into the banking center." *Id.* ¶ 7.

According to Dorn, as of November 20, 2018, "the current balance on Neal's credit card account (ending in 2135) was $23,193.16, with interest accruing on the second day of each month in the amount of $287.35. ECF 24-2, ¶ 14. Neal admits that as of November 20, 2018, she owes money to PenFed on that account but "dispute[s] that the exact amount owed is $23,193.16." ECF 29-1, ¶ 33.

Further, Dorn states that as of November 20, 2018, "the current balance on Neal's personal loan (account ending in 1702) was $17,300.56, with interest accruing on a daily basis in the amount of $4.223293." ECF 24-2, ¶ 11. Neal admits that as of November 20, 2018, she owed money to PenFed in her personal account ending in 1702 but "dispute[s] that the total amount owed is $17,300.56." ECF 29-1, ¶ 32.

In addition to the personal loan and credit card, "PenFed has extended credit to Neal in the form of overdraft protection, referred to as 'Thrifty Credit Service,' in connection with two checking accounts [that Neal] maintains with PenFed." ECF 24-2, ¶ 16. According to Dorn, as of

November 20, 2018, "the current balance on Neal's Thrifty Credit Service line in connection with her checking account ending in account number 5775 was $1,956.39, with interest accruing in a daily basis in the amount of $.67115." *Id.* ¶ 17. Neal admits that she owes money to PenFed in connection with her checking account ending in 5775 but "den[ies] that the amount is $1,956.39." ECF 29-1, ¶ 34.

And, Dorn avers that as of November 20, 2018, "the current balance on Neal's Thrifty Credit Service line in connection with her checking account ending in account number 7776 was $2,652.56, with interest accruing on a daily basis in the amount of $.810136." ECF 24-2, ¶ 18. Neal admits that she owes money to PenFed in connection with her checking account ending in 7776 but "den[ies] that the amount owed is $810136 [sic]." ECF 29-1, ¶ 35.

Additional facts are included, *infra*.

## II.     Legal Standard

PenFed has moved for summary judgment, supported by numerous exhibits. *See* ECF 24-1 (Exhibits Index). As a threshold matter, I must determine whether summary judgment is appropriate at this stage of litigation, as no discovery has taken place.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011). As the Fourth Circuit has said, a summary judgment motion prior to discovery is akin to "forc[ing] the non-moving party into a fencing match without a sword or mask." *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014)); accord *Putney v. Likin*, 656 F. App'x 632, 639 (4th Cir. 2016) (per curiam).

However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the

motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)); *see also Dave & Buster's Inc. v. White Flint Mall, LLLP*, 616 F. App'x 552, 561 (4th Cir. 2015). To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"'[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to the [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 875 (4th Cir. 2019); *Gordon v. Cigna Corp.*, 890 F.3d 463, 479 (4th Cir. 2018); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 Fed. Appx. 274 (4th Cir. 2008) (per curiam), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at her peril, because "'the failure to file an affidavit…is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment

ruling that is obviously premature. And, a court "should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008).

Plaintiff has not filed an Affidavit under Rule 56(a). And, of import here, she does not assert the need for discovery. Indeed, the facts are largely undisputed, with the exception of plaintiff's claim that she did not receive certain PenFed cardholder agreements and membership documents. And, both sides have submitted multiple exhibits. Therefore, I am satisfied that it is appropriate to address defendant's Motion as one for summary judgment, as this will facilitate resolution of the case.

Fed. R. Civ. P. 56(a) provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Formica v. Aylor*, 739 Fed. App'x 745, 754 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found. v.*

*Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).  The nonmoving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon*, 890 F.3d at 470.

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.  There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252.  And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 514 U.S. 1042

(2004); *see also Celotex*, 477 U.S. at 322-24.  And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017);  *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).  Thus, in considering a summary judgment motion, the court may not make credibility determinations.  *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007).  Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

In sum, to avoid summary judgment, there must be a genuine dispute as to material fact.  In *Iraq Middle Mkt. Dev. Found.*, 848 F.3d at 238, the Court reiterated: "A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."

### III. Discussion

As indicated, PenFed moves for summary judgment as to Neal's breach of contract claim (Count II) and her EFTA claim (Count IX). ECF 24. PenFed also moves for summary judgment as to its breach of contract claims in Counts I, II, and III of its Counterclaim. *Id*. at 17.

### A. Principles of Contract Construction[8]

The parties' relationship is contractual in nature. *See University Nat'l Bank v. Wolfe*, 279 Md. 512, 514, 369A 2d 570 (1977); *Kiley v. First Nat'l Bank of Md.*, 102 Md. App. 317, 326, 649 A.2d 1145, 1149 (1994), *cert. denied*, 338 Md. 116, 656 A.2d 772 (1995), *cert. denied*, 516 U.S. 866 (1995). Neal seems to argue that PenFed was contractually barred from taking statutorily protected benefits. Therefore, in analyzing the parties' claims for breach of contract, it is helpful to review the principles of contract formation and contract interpretation.

In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." RICHARD A. LORD, 1 WILLISTON ON CONTRACTS § 1:1, at 2-3 (4th ed. 1990); *accord* Restatement (Second) Contracts § 1, at 5 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421-22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006). "'A contract is formed when an unrevoked offer made by one person is accepted by another.'" *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's County v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)). Thus, mutual assent is an integral component of every contract. *See, e.g.*, *Joseph Saveri Law Firm Inc. v.*

---

[8] As discussed in the Memorandum Opinion of November 5, 2018, Neal's State law claims, including her breach of contract claim, are governed by Maryland law. ECF 19 at 13-14. And, PenFed does not dispute the application of Maryland law with respect to its counterclaims for breach of contract. ECF 24 at 9 n.3. Therefore, I shall apply Maryland law as to PenFed's contract claims.

*Michael E. Criden, P.A.*, 759 F. App'x 170, 173 (4th Cir. 2019) (recognizing as a "bedrock principle of law" that an offeree must accept an offer to form a contract); *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).

In determining whether there is an enforceable contract, courts begin the analysis "by discussing the essential l prerequisite of mutual assent to the formation of a contract . . . ." *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015); *see also Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'" (citations omitted)). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

A contract may be oral or written. Whether oral or written, a contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement. *Forty W. Builders*, 178 Md. App. at 377-78, 941 A.2d at 1209-10; *see Canaras v. Lift Truck Services*, 272 Md. 337, 346, 322 A.2d 866, 871 (1974). If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable. *Mogavero v. Silverstein*, 142 Md. App. 259, 272, 790 A.2d 43, 51 (2002); *see L & L Corp. v. Ammendale*, 248 Md. 380, 385, 236 A.2d 734, 737 (1967); *Schloss v. Davis*, 213 Md. 119, 123, 131 A.2d 287, 290 (1956) (stating that a "contract may be so vague and uncertain as to price or amount as to be unenforceable").

"'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'"

*Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted). To determine the parties' intention, courts look first to the written language of the contract. *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("[G]enerally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement."); *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated."), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997).

Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017).

"Maryland courts interpreting written contracts have long abided by the law of objective contract interpretation, which specifies that 'clear and unambiguous language' in an agreement 'will not give way to what the parties thought the agreement meant or was intended to mean.'" *Urban Growth Prop. Ltd. P'ship v. One W. Balt. St. Assocs. LLC*, No. 882, Sept. Term, 2015, 2017 WL 526559, at *5 (Md. Ct. Spec. App. Feb. 9, 2017) (citation omitted) (unpublished); *see Cochran*, 398 Md. at 16, 919 A.2d at 709; *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014) (internal quotations and alteration omitted). The court's "task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at

the time of the agreement." *Dumbarton*, 434 Md. at 52, 73 A.3d at 232. Rather, the court is to "'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Id.* (quoting *Gen. Motors Acceptance v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)).

To determine the parties' intention, courts first look to the written language of the contract. *See Walton*, 391 Md. at 660, 894 A.2d at 594. "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632-33 (2003) (citations omitted). A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean. *See Dumbarton*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001); *see also, e.g.*, *Scarlett Harbor,* 109 Md. App. at 291, 674 A.2d at 142 ("Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed.").

The question of whether a contract is ambiguous is one of law. *Towson Univ.*, 384 Md. at 78, 862 A.2d at 946; *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163, 829 A.2d 540, 544 (2003). Notably, a contract is not ambiguous merely because the parties do not agree on its meaning. *Fultz v. Shaffer*, 111 Md. App. 278, 299, 681 A.2d 568, 578 (1996). Rather, a contract is ambiguous "when the language of the contract is susceptible of more than one meaning to a reasonably prudent person." *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 340, 731 A.2d 441, 444-45 (1999); *see also Cochran*, 398 Md. at 17, 919 A.2d at 710; *Sy-Lene of Washington*, 376 Md. at 167, 829 A.2d at 547; *Calomiris v. Woods*, 353 Md. 425, 436,

727 A.2d 358, 363 (1999).

To determine whether a contract is ambiguous, a court considers "the character of the contract, its purpose, and the facts and circumstances of the parties at the time" that they enter into the contract. *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985). But, "'[i]f only one reasonable meaning can be ascribed to the [contract] when viewed in context, that meaning necessarily reflects the parties' intent.'" *Forty W. Builders*, 178 Md. App. at 377, 941 A.2d at 1209 (quoting *Labor Ready, Inc. v. Abis*, 137 Md. App. 116, 128, 767 A.2d 936, 942 (2001)).

Notably, a court will not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." *Brensdel v. Winchester Constr. Co.*, 392 Md. 601, 623, 898 A.2d 472, 485 (2006). Indeed, "[i]t is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris v. Woods*, 353 Md. 425, 445, 727 A.2d 358, 368 (1999) (*quoting Canaras v. Lift Truck Servs.*, 272 Md. 337, 350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 1443 (Table), 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam) ("[A] court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck.").

A contract may be express or implied. The Maryland Court of Appeals has explained the distinctions between an "express contract," a "contract implied-in-fact," and a "contract implied-in-law."

"An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit

language, either orally or in writing." *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cty. Comm'rs of Caroline Cty v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000)) (emphasis omitted).

A contract implied-in-fact, or an "implied contract," is "an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of men." *Maryland Cas. Co.*, 442 Md. at 706, 114 A.3d at 688; *see also Dashiell*, 358 Md. at 94, 747 A.2d at 606 ("An implied contract is an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of men.") (internal quotation and citations omitted).

An implied-in-fact contract "is 'inferred from conduct of parties and arises where plaintiff, without being requested to do so, renders services under circumstances indicating that he expects to be paid therefore, and defendant, knowing such circumstances, avails himself of [the] benefit of those services.'" *Dashiell*, 358 Md. at 95 n.6, 747 A.2d at 606 n.6 (citation omitted); *see Mogavero*, 142 Md. App. at 275, 790 A.2d at 52 ("An implied-in-fact contract is a 'true contract' and 'means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words.'"); *Slick v. Reinecker*, 154 Md. App. 312, 318, 839 A.2d 784, 787 (2003) ("'The term [implied in fact contract] only means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words.'") (quoting *Mass Transit Admin. v. Granite Constr. Co.*, 57 Md. App. 766, 774, 471 A.2d 1121 (1984)) (emphasis omitted) (bracketed comments added in *Slick*).

Thus, an implied-in-fact contract "'*refers to that class of obligations which arises from mutual agreement and intent to promise*, when the agreement and promise have *simply not been*

*expressed in words.* Despite the fact that no words of promise or agreement have been used, *such transactions are nevertheless true contracts*, and may properly be called inferred contracts or contracts implied in fact.'" *Mohiuddin v. Doctors Billing & Management Solutions, Inc.* 196 Md. App. 439, 448, 9 A.3d 859, 865 (2010) (quoting 1 Richard A. Lord, *Williston on Contracts*, § 1.5, pp. 20-21 (1990)) (emphasis in *Mohiuddin*). "Recovery on a contract implied in fact . . . is based on the amount that the parties intended as the contract price or, if that amount is unexpressed, the fair market value of the plaintiff's services." *Mogavero*, 142 Md. App. at 276, 790 A.2d at 53.

A contract implied-in-law, also known as a "quasi-contract," or unjust enrichment, is a "[l]egal fiction invented by common law courts to permit recovery by contractual remedy in cases where, in fact, there is no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise." *Maryland Cas. Co.*, 442 Md. at 707, 114 A.2d at 689 (emphasis and citations omitted); *see Mohiuddin*, 196 Md. App. at 449, 9 A.3d at 865 (quoting Restatement (Second) of Contracts, § 4 (1981)); *accord Dashiell*, 358 Md. at 95 n.6, 747 A.2d at 606 n.6 ("A contract implied by law is now what commonly is called quasi-contract . . . ."). However, "'unlike true contracts, quasi-contracts are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises. *They are obligations created by law for reasons of justice*.'" *Mohiuddin*, 196 Md. App. at 449, 9 A.3d at 865 (citation omitted) (emphasis in *Mohiuddin*).

In Maryland, a quasi-contract claim may not be brought where the subject matter of the claim is covered by an express contract between the parties. *Janusz v. Gilliam*, 404 Md. 524, 537, 947 A.2d 560, 567 (2008) (internal quotation marks omitted); *see also Dashiell*, 358 Md. at 101, 747 A.2d at 610 ("We hold that, generally, quasi-contract claims such as quantum meruit and unjust enrichment cannot be asserted when an express contract defining the rights and remedies of

the parties exists."); *see also FLF, Inc. v. World Publ'ns, Inc.*, 999 F. Supp. 640, 642 (D. Md. 1998) ("It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties.").

In *Dolan v. McQuaide*, 215 Md. App. 24, 37, 79 A.3d 394, 402 (2013), the Maryland Court of Special Appeals wrote (emphasis in original): "This taxonomy can be summed up, as follows: 1) an express contract arises from *verbal* communication of *definite terms;* 2) a contract implied-in-fact arises from *actions* implying *definite terms;* and 3) unjust enrichment arises from *actions* that do *not* imply *definite terms.*"[]

### B. Plaintiff's Breach of Contract Claim (Count II)

In Count II, Neal contends that the Promissory Note, or "PenFed's loan agreement," constituted an "enforceable contract between PenFed [and] plaintiff[.]" ECF 13, ¶ 88. She asserts that "PenFed wrongfully withdrew funds" from her deposit accounts, and that "there was [no] disclosure by PenFed that plaintiff's future disability benefits would be taken from her deposit account to pay any delinquencies." ECF 13, ¶¶ 93-94. Further, plaintiffs asserts: "At the time of signing the loan agreement, plaintiff knew and believed that the agreement would not affect any veterans disability benefits she would receive in the future." *Id.* ¶ 90. PenFed, she argues, "intentionally knew that if they informed plaintiff…that [her] veterans disability benefits would be taken in the future, plaintiff . . . would decline and take [her] business to another credit union." *Id.* ¶ 91.

In her Opposition, Neal argues that "PenFed's promissory note . . . was vague, ambiguous and as such invalid." ECF 29 at 12. In particular, she points to the following provision of the Promissory Note as "vague and ambiguous," ECF 24-8 at 2:

24

I give my express consent to enable PenFed to charge against any balance in any of my PenFed accounts, including accounts on which I am a joint owner, to include any otherwise statutorily protected funds that may not otherwise be available by legal process, to liquidate any PenFed indebtedness or other outstanding financial obligation owed by me or any person who is listed as a joint owner on my accounts[.]

In her Declaration, plaintiff avers that if she knew at the time of signing the Promissory Note that her "veterans disability benefits would be taken out and applied to satisfy any loan delinquencies," she "would not have agreed to enter into any loan or credit card agreements with PenFed" and "would have taken [her] business to another bank." ECF 29-1, ¶ 29.

In a breach of contract claim, "a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor*, 365 Md. at 175, 776 A.2d at 651. Neal has not identified any contractual obligation allegedly breached by PenFed. Rather, she argues that the Promissory Note is "vague," and is thus an "invalid" contract. ECF 29 at 12. Plaintiff cannot assert this new claim by raising it in her Opposition. *See Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F. App'x 556, 563 (4th Cir. 2008) (recognizing that a plaintiff cannot amend his complaint by a brief in opposition to a motion for summary judgment).

According to plaintiff, "a depositor may sue in an action for breach of contract to enforce the bank's contractual obligation to use ordinary care." ECF 29 at 13 (citing *Taylor v. Equitable Trust Co.*, 269 Md. 149, 304 A.2d 838 (1973)). And, she contends that defendant breached "the duty" to "use ordinary care in disbursing the depositor's funds." *Id*. at 13 (citing *Cmm'w Bank v. Goodman*, 128 Md. 452, 97 A. 1005, 1008 (1916)).

Maryland courts have long recognized that the relationship of a bank and its customer is "that of debtor and creditor," with "the rights of the depositor and the liability of the bank being contractual." *Taylor*, 269 Md. at 155, 304 A.2d at 842; *see also G&D Furniture Holdings, Inc. v. SunTrust Bank*, TDC-16-2020, 2016 WL 7441607, at *4 (D. Md. Dec. 22, 2016); *Lema*, 375 Md.

at 638, 826 A.3d at 511. This contract, "implied in banking relations," includes an "obligation to pay the funds only as authorized." *Wolfe*, 279 Md. at 521, 369 A.2d at 575; *see Dunlop Sand & Gravel Corp. v. Hospelhorn*, 172 Md 279, 191 A. 701, 706 (1937) (stating that a "general deposit of money in a commercial bank" creates a "relation of debtor and creditor, the depositor having in addition to his rights as creditor certain contract rights against the bank").

Maryland Code (2013 Repl. Vol., 2018 Supp.), § 4–103(a) of the Commercial Law Article ("C.L.") allows parties to a banking contract, to some extent, to vary, by agreement, the "Bank Deposits and Collections" provisions.[9] But, a party "cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure." C.L. § 4-103(a); *see also Schultz v. Bank of Am., N.A.,* 413 Md. 15, 38, 990 A.2d 1078, 1092 (2010). Therefore, a "depositor may sue in an action for breach of contract to enforce the bank's contractual obligation to use ordinary care" in disbursing the depositor's funds. *Gillen v. Md. Nat'l Bank*, 333 A.2d 329, 333 (1975) (citing *Cmm'w Bank*, 128 Md. 452, 97 A. at 1008); *see also Bottini v. Dep't of Fin.*, 450 Md. 177, 209, 147 A.3d 371, 390 (2016); *Schultz,* 413 Md. at 38, 990 A.2d at 1092 (observing that "bank customers may enforce the duty of ordinary care . . . through an action for breach of contract").

Under Maryland law, PenFed owes a duty of ordinary care to its customers. C.L. § 4–103(a); *Lema*, 375 Md. at 638, 826 A.3d at 511. However, as the Maryland Court of Appeals made clear in *Schultz*, 413 Md. at 38, 990 A.2d at 1092, that the existence of "such a duty" is "not enough to put" a plaintiff's "breach of contract claim before the jury."

Other than her own Declaration, Neal has failed to proffer any evidence establishing PenFed's breach of such a duty. She maintains that she "did not agree to have [her] veterans

---

[9] Pursuant to C.L. § 4-105(1), the term "Bank" includes a credit union.

disability benefits . . . taken by PenFed to satisfy any loan delinquencies and it was not made known to [her] in the loan agreement." *Id.* ¶ 19. And, plaintiff maintains that she "never received" any copies of the Membership Disclosures (ECF 24-4 – ECF 24-6) or the Cardholder Agreement (ECF 24-10) from PenFed. But, when Neal opened her first account in 2002, she signed the Membership Application, representing that she read and accepted the Membership and Account Agreements. ECF 24-3 at 3. And, in Neal's Declaration, she admits that her signature appears on the Promissory Note (ECF 24-8). Both the Membership Disclosures and the Promissory Note provided Neal's consent to PenFed's transfer of statutorily protected funds from her PenFed accounts to cover debts she owed to PenFed. ECF 24-4; ECF 24-8 at 2.

Neal contends that, "without being provided a copy of [her] loan agreements," she does "not recall if it was the actual agreement that [she] signed." ECF 29-1, ¶ 18. She also asserts that the Promissory Note is ambiguous as to whether the provision applies to veteran's disability benefits because the term "statutorily protected funds . . . could include anything type [sic] of statutorily protected funds." ECF 29 at 16. However, "language is not ambiguous simply because it is general in nature or undefined by the policy. In fact, ambiguity arises only if the language is reasonably susceptible to more than one meaning by a reasonably prudent layperson." *Walker v. Fireman's Fund Ins. Co.*, 66 Md. App. 687, 692, 505 A.2d 884, 886 (1986) (internal citation omitted); *see also Interstate Fire and Cas. Co. v. Dimensions Assurance Ltd.*, 843 F.3d 133, 138 (4th Cir. 2016) (citing *Walker*). The language is not ambiguous.

In addition, as defendant points out, "both Maryland and federal law permit the types of transactions at issue in this case." ECF 30 at 3. In *Lomax v. Comptroller of the Treasury*, 323 Md. 419, 427, 593 A.2d 1099, 1103 (1991), the Maryland Court of Appeals observed: "It is a

fundamental principle of creditors' rights that creditors have a right to set-off and may apply moneys owed to debts due."

Further, the Federal Credit Union Act ("FCUA"), 12 U.S.C. §§ 1751 *et seq.*, permits federal credit unions, *inter alia*, "to impress and enforce a lien upon the shares and dividends of any member, to the extent of any loan made to him and any dues or charges payable to him." 12 U.S.C. § 1757(11). Of import here, the implementing regulations of the FCUA provide, in relevant part, that "a credit union can impress a statutory lien on a member's account(s) . . . . By giving notice thereof in the member's account agreement(s) or other account opening documentation; or . . . by giving notice thereof in a loan document signed or otherwise acknowledged by the member(s)[.]" 12 C.F.R. § 701.39(c)(1), (2).

It is undisputed that Neal was in default on her obligations to defendant. And, in accordance with 12 C.F.R. § 701.39(c), the Promissory Note signed by Neal provided notice to plaintiff that PenFed may transfer funds out of her accounts to cover debts she owed to PenFed. ECF 24-8 at 2.

Neal's inability to recall if the content of the Promissory Note submitted by PenFed corresponds to the content of the one she signed is not sufficient to defeat summary judgment. *See Anderson*, 477 U.S. at 249 (concluding that to withstand a motion for summary judgment, the nonmoving party must proffer sufficient evidence on which a reasonable jury could find in its favor). In *Jeandron v. Board of Regents of University System of Maryland*, 510 F. App'x 223, 228 (4th Cir. 2013), the Court said: "A self-serving affidavit, without more, is not sufficient to defeat summary judgment."

Defendant is entitled to summary judgment as to plaintiff's breach of contract claim.

### C. Plaintiff's Count IX: Violation of EFTA

In Count IX of the Amended Complaint, Neal insists that PenFed violated the EFTA because "Neal was never provided a copy of any authorization" that stated PenFed "would take her veterans disability benefits incase [sic] of a default in loan repayment." ECF 13, ¶ 144. Further, she asserts that "PenFed never made it clear and readily identifiable in its loan agreements to the veteran plaintiff" that her "veterans disability benefits would be transferred from" her deposit account. *Id.* ¶ 147. In addition, she claims that in July 2017 she complained to PenFed "that her veterans disability benefits had been transferred in error . . . ." *Id.* ¶ 148. And, in response to Neal's complaint, PenFed did not make "a good faith investigation of the alleged error . . . ." *Id.* ¶ 149.

PenFed contends that plaintiff's EFTA claim fails for three reasons: "(i) Neal lacks standing under Article III of the U.S. Constitution because she did not suffer an injury-in-fact; (ii) PenFed did not violate EFTA; and (iii) the safe harbor provision of EFTA applies." ECF 30 at 7.

### 1. The EFTA

In 1978, Congress enacted the EFTA as part of the comprehensive Consumer Credit Protection Act ("CCPA"), codified as amended at 15 U.S.C. § 1601 *et seq. See Clemmer v. Key Bank Nat'l Ass'n*, 539 F.3d 349, 350 (6th Cir. 2008). The EFTA was enacted "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." 15 U.S.C. § 1693(b). The EFTA is a "'remedial consumer protection statute'" that is "'read liberally'" to achieve its goal of protecting consumers. *Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 239 (4th Cir. 2019) (quoting *Phelps v. Robert Woodall Chevrolet, Inc.*, 306 F. Supp. 2d 593, 596 (W.D. Va. 2003)) (describing the TILA and the EFTA) (alteration omitted).

The EFTA states, in relevant part: "The terms and conditions of electronic fund transfers involving a consumer's account shall be disclosed at the time the consumer contracts for an electronic fund transfer service[.]" 15 U.S.C. § 1693c(a). Further, the Act provides: "A preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." *Id*. § 1693e(a).

The Act defines a "preauthorized electronic fund transfer" as an "electronic fund transfer authorized in advance to recur at substantially regular intervals." *Id*. § 1693a(10); 12 C.F.R. § 1005.2(k). And, an "unauthorized electronic fund transfer" is defined as "an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and *from which the consumer receives no benefit*[.]" 15 U.S.C. § 1693a(12) (emphasis added). But, the term does not include any electronic transfer fund

> (A) initiated by a person other than the consumer who was furnished with the card, code, or other means of access to such consumer's account by such consumer, unless the consumer has notified the financial institution involved that transfers by such other person are no longer authorized, (B) initiated with fraudulent intent by the consumer or any person acting in concert with the consumer, or (C) which constitutes an error committed by a financial institution.

Regulation E provides that, in general, § 1693c(a) applies "to any electronic fund transfer that authorizes a financial institution to debit or credit a consumer's account." 12 C.F.R. § 1005.3(a). However, the following is excluded from coverage:

> (c) Exclusions from coverage. The term "electronic fund transfer" does not include:

> * * * *

> (5) Automatic transfers by account-holding institution. Any transfer of funds under an agreement between a consumer and a financial institution which provides that the institution will initiate individual transfers without a specific request from the consumer:
> > i) Between a consumer's accounts within the financial institution;

> ii) From a consumer's account to an account of a member of the consumer's family held in the same financial institution; or
>
> iii) Between a consumer's account and an account of the financial institution, except that these transfers remain subject to § 1005.10(e) regarding compulsory use and sections 916 and 917 of the Act regarding civil and criminal liability.

*Id.* § 1005.3(c)(5).

The EFTA's safe harbor provision, 15 U.S.C. § 1693m(e), provides:

> A person has no liability under this section for any failure to comply with any requirement under this subchapter if, prior to the institution of an action under this section, the person notifies the consumer concerned of the failure, complies with the requirements of this subchapter, and makes an appropriate adjustment to the consumer's account and pays actual damages or, where applicable, damages in accordance with section 1693h of this title.

## 2. Standing

Defendant argues that Neal lacks standing under Article III to assert a violation of the EFTA.[10] Therefore, an overview of the principles underpinning Article III standing is helpful.

To establish standing under Article III of the Constitution, a plaintiff must satisfy three elements. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). They are, *id.* (internal quotation marks and citations omitted):

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

---

[10] PenFed did not challenge plaintiff's standing in its motion to dismiss. *See* ECF 16 at 14. However, as the Supreme Court recently observed: "Unlike most arguments, challenges to subject-matter jurisdiction may be raised by a defendant 'at any point in the litigation,' and courts must consider them *sua sponte.*" *Fort Bend County v. Davis*, ___ U.S. ___, 139 S. Ct. 1843, 1849 (2019) (quoting *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012)).

*See also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 168 (2014); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *Overbey v. Mayor and City Council of Balt.,* ___ F.3d ___, 2019 WL 3022327, at *7 (4th Cir. July 11, 2019); *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018); *Cahaly v. Larosa*, 796 F.3d 399, 406 (4th Cir. 2015); *Lane v. Holder*, 703 F.3d 668, 671 (4th Cir. 2012); *Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011).

As noted, the plaintiff must allege an injury in fact. It is defined as "'an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical.'" *Overbey*, 2019 WL 3022327, at *8 (citation omitted); *see In Re Trump*, 928 F.3d 360, 374 (4th Cir. 2019). And, "[t]he standing requirement applies to each claim that a plaintiff seeks to press." *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014). And, the stage of litigation is pertinent to the analysis; given the posture of this case, standing must be considered through "the summary-judgment lens." *Overbey*, 2019 WL 3022327, at *8.

It is a bedrock principle that Article III of the Constitution limits judicial power to "actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.,* 494 U.S. 472, 477 (1990) (citations omitted); *see Clapper,* 568 U.S. at 488. "Indeed, 'no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" *Dreher v. Experian Info. Solutions, Inc.,* 856 F.3d 337, 343 (4th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. ——, 136 S.Ct. 1540, 1547 (2016)).

Therefore, during the pendency of a case, an actual controversy must exist. *See Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974); *Williams v. Ozmint*, 716 F.3d 801, 808 (4th Cir. 2013). Conversely, in the absence of a case or controversy, "the court's subject matter jurisdiction ceases

to exist . . . . " *S.C. Coastal Conservation League v. U.S. Army Corps. of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015); *see Gardner v. GMAC, Inc.*, 796 F.3d 390, 395 (4th Cir. 2015) (same).

"One element of the case-or-controversy requirement" is that a plaintiff must establish standing to sue. *Raines v. Byrd*, 521 U.S. 811, 818 (1997); *see Spokeo, Inc.*, 136 S.Ct. at 1547 ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."). The *Clapper* Court explained, 568 U.S. at 408: "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."

The doctrine of standing consists of two distinct "strands": constitutional standing, pursuant to Article III, and prudential standing. *Elk Grove Unified Sch. Dist.*, 542 U.S. at 11. As discussed, *infra*, "the standing inquiry asks whether a plaintiff had the requisite stake in the outcome of a case . . . ." *Deal v. Mercer Cty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018) (citing *Friends of the Earth. Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)); *see Summers v. Earsh Island Inst.*, 555 U.S. 488, 492-93 (2009); *In re Trump*, 928 F.3d 360, 374 (4th Cir. 2019). Under Article III, "a party invoking the jurisdiction of a federal court [must] seek relief for a particularized injury," which is a requirement that "serves vital interests going to the role of the judiciary in our system of separated powers." *Hollingsworth v. Perry*, 570 U.S. 693, 696 (2013).

In addition to satisfying constitutional standing requirements, a plaintiff must also demonstrate that her claims are not barred by prudential limitations on a federal court's exercise of jurisdiction. *United States v. Windsor*, 570 U.S. 744 (2013); *see also, e.g., Elk Grove Unified Sch. Dist.*, 542 U.S. at 11; *Doe v. Sebelius*, 676 F.Supp.2d 423, 428 (D. Md. 2009). Prudential

standing "'embodies judicially self-imposed limits on the exercise of federal jurisdiction.'" *Elk Grove Unified Sch. Dist.*, 542 U.S. at 11 (citation omitted).

One such limitation is that "a plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). This limitation serves to "preclude a court from deciding 'questions of broad social import in cases in which no individual rights will be vindicated'" and to ensure that "'access to the federal courts [is] limited to those litigants best suited to assert the claims.'" *Buchanan v. Consolidated Stores Corp.*, 125 F.Supp.2d 730, 738 (D. Md. 2001) (quoting *Mackey v. Nationwide Ins. Co.*, 724 F.2d 419, 422 (4th Cir. 1984)).

PenFed argues that Neal lacks standing as "she did not suffer an injury-in-fact because she owed the money at issue." ECF 30 at 8. In support, PenFed relies on *Aikens v. Portfolio Recovery Associates*, 716 F. App'x 37 (2d Cir. 2017) (unpublished). There, the Second Circuit considered the question of whether a plaintiff had alleged a concrete injury for purposes of standing under the EFTA. *Id.* at 39.

The plaintiff, Aikens, and a debt collector, PRA, "entered into an oral agreement over the telephone," whereby Aikens permitted PRA automatically to debit her checking account each month until her debt was satisfied. *Aikens v. Portfolio Recovery Assocs. LLC*, 16-cv-1159, 2017 WL 1091591, at *1 (E.D.N.Y. Mar. 22, 2017). After PRA debited her account for nearly a year, Aikens filed suit under the EFTA, asserting that PRA failed to obtain her consent for the automated transfers in writing and failed to provide her "with a copy of her signed, written authorization." *Id.* PRA moved to dismiss the plaintiff's allegations, pursuant to Fed. R. Civ. P. 12(b)(1), for lack of subject matter jurisdiction. *Id.*

The district court found, under *Spokeo*, 136 S. Ct. 1540, that Aikens lacked standing and dismissed the action with prejudice. *Id*. at *2. The court concluded:

> There is no concrete injury here. Plaintiff authorized PRA to withdraw money from her account to repay the debt she owed. PRA did not take more money than was agreed to. Nor did they withdraw the money from any other account than that which Plaintiff authorized. The Court fails to see how Plaintiff suffered any injury here whatsoever.

The Second Circuit affirmed the district court's dismissal for lack of subject matter jurisdiction, but remanded the case with instructions that the district court amend its judgment as a dismissal without prejudice. *Aikens*, 716 F. App'x at 41. The *Aikens* Court noted that although the "EFTA limits consumer liability for 'unauthorized electronic fund transfers,' 15 U.S.C. § 1693g, it treats a transfer as 'unauthorized' only if the 'the [sic] consumer receives no benefit,' *id*. § 1693a(12).'" *Aikens*, 716 F. App'x at 41. The Second Circuit reasoned that "PRA's withdrawals provided Aikens the decided benefit of reducing her debt. Moreover, a transfer is not 'unauthorized' under the EFTA when . . . the consumer herself furnished the 'means of access' to her bank account and never asked her bank to stop the transfers." *Id*. (citation omitted).

PenFed contends that, like the plaintiff in *Aikens*, Neal did not suffer "any actual harm." ECF 30 at 80. As the Second Circuit recognized, the EFTA treats a transfer as "unauthorized" only if "the consumer receives no benefit." 15 U.S.C. § 1693a(12). And, PenFed asserts that Neal received a benefit because PenFed's transfer of funds was applied to reduce Neal's debts, which she admits she owed. ECF 30 at 9.

In response, Neal argues that *Aikens* is distinguishable, because she "objected to the transfer of her veterans benefits when they were made." ECF 29 at 18. In plaintiff's Declaration, she avers that in early July 2017, she "was informed by PenFed that [it] had transferred veterans disability benefits from [her] deposit account to cover for loan delinquencies" that she "had with

PenFed." ECF 29-1, ¶ 10. Thereafter, she "objected to any further transfer of [her] veterans disability benefits by PenFed to cover for the loan delinquencies" and PenFed told her "there is nothing that [it] could do to stop it because [she] owed the money." *Id.* ¶ 11.

I am persuaded that Neal has standing to assert a claim under the EFTA. Unlike the plaintiff in *Aikens*, Neal maintains that she objected to the transfers. *See* ECF 29-1, ¶ 10. And, if her claim is meritorious, she will have suffered an injury. To have standing, it is not required that plaintiff prevail on the merits of her claim.

### 3. EFTA Violation

PenFed argues that plaintiff's "EFTA claim fails because she cannot prove PenFed violated EFTA for two reasons." ECF 24 at 14. Defendant contends that the EFTA does not apply to the transactions at issue. *Id.*

As discussed, the EFTA, in general, "applies to any electronic fund transfer that authorizes a financial institution to debit or credit a consumer's account." 12 C.F.R. § 1005.3. However, Regulation E contains the following exception, *id.* § 1005.3(c)(5):

> (c) Exclusions from coverage. The term "electronic fund transfer" does not include:
>
> \*　　\*　　\*
>
> (5) Automatic transfers by account-holding institution. Any transfer of funds under an agreement between a consumer and a financial institution which provides that the institution will initiate individual transfers without a specific request from the consumer:
> > i) Between a consumer's accounts within the financial institution;
> > ii) From a consumer's account to an account of a member of the consumer's family held in the same financial institution; or
> > iii) Between a consumer's account and an account of the financial institution, except that these transfers remain subject to § 1005.10(e) regarding compulsory use and sections 916 and 917 of the Act regarding civil and criminal liability.

PenFed contends that the transactions at issue fall within the foregoing exception because they were made "[b]etween a consumer's accounts within the financial institution," *i.e.*, between Neal's deposit accounts and her loan accounts, pursuant to the Membership Application (ECF 24-3) and the Promissory Note (ECF 24-8 at 2). ECF 24 at 15. As a result, the transactions "are not covered by the relevant provisions of EFTA." *Id.*

In response, Neal argues that the transactions at issue were not made pursuant to "an agreement between a consumer and a financial institution which provides that the institution will initiate individual transfers without a specific request from the customer[.]" 12 C.F.R. § 1005.3(c)(5). This argument is unavailing. As discussed, in the Promissory Note signed by Neal, she consented to PenFed's transfer of "otherwise statutorily protected funds" out of "any of [her] PenFed accounts" to cover debts she owed to PenFed. ECF 24-8 at 2.

Further, plaintiff contends that the exclusion does not apply because the transactions at issue "were not automatic transfers." ECF 29 at 21. According to plaintiff, the transactions were "manual transfers . . . initiated by PenFed on its own volition." *Id.* However, Neal does not explain the distinction she is attempting to draw between automatic and manual transfers. Nor does she cite any evidence in support of her argument that the transfers were manual.

Accordingly, I agree with defendant that the EFTA does not apply to the transactions at issue in this case. Therefore, PenFed is entitled to summary judgment as to Count IX.

### D. Defendant's Counterclaims – Counts I, II, and III

As indicated, PenFed asserts three breach of contract claims.

In Count I, PenFed asserts that it "extended credit to Neal in the form of overdraft protection, referred to as 'Thrifty Credit Service,' in connection with two checking accounts she opened with PenFed." ECF 23, ¶ 7. PenFed claims that Neal "defaulted on her contractual

obligation to repay the amounts loaned to her through the Thrifty Credit Service." *Id*. ¶ 8.  With respect to Neal's checking account ending in account number 5775, PenFed states it "has suffered damages in the amount of $1,956.39 as of November 20, 2018, with interest accruing on a daily basis in the amount of $.67115." *Id*. ¶ 16.  As to Neal's checking account ending in account number 2652, PenFed "has suffered damages in the amount of $2,652.56 as of November 20, 2018, with interest accruing on a daily basis in the amount of $.810136." *Id*. ¶ 17.

As to Count II, PenFed asserts that on May 6, 2015, "Neal submitted a credit card application to PenFed." *Id*. ¶ 9.  It "approved the credit card application and issued a credit card to Neal," and "Neal authorized charges to be made on the credit card." *Id*. ¶¶ 10-11.  PenFed claims that "Neal defaulted on her obligation to repay the amounts charged to the credit card." *Id*. ¶ 12.  As a result, it "has suffered damages in the amount of $23,193.16 as of November 20, 2018, with interest accruing on the second day of each month in the amount of $287.35" *Id*. ¶ 19.

In Count III, PenFed states that on July 7, 2015, it "extended a personal loan to Neal." *Id*. ¶ 13.  And, Neal defaulted on her repayment obligations.  *Id*. ¶ 14.  PenFed claims that as a result of Neal's default, it "has suffered damages in the amount of $17,300.56 as of November 20, 2018, with interest accruing on a daily basis in the amount of $4,223.293."

In support of these claims, PenFed has submitted the Declaration of John Dorn (ECF 24-2), a Vice President of Collections.  He avers that Neal defaulted on her repayment obligations in connection with her personal loan, credit card, and Thrifty Credit Service lines, and owes the specified amounts, plus interest.  *Id*. ¶¶ 15-18.

In plaintiff's Declaration, she admits that she has defaulted on her repayment obligations and owes money to PenFed.  ECF 29-1, ¶¶ 32-35.  However, she disputes the total amount that she owes.  *Id*.

Accordingly, summary judgment in favor of PenFed is appropriate on the issue of plaintiff's liability alone. But, the parties' competing affidavits demonstrate a genuine dispute of material fact as to the amount owed by plaintiff to PenFed. *See Black & Decker*, 436 F.3d at 442; *Dennis*, 290 F.3d at 644-45; *see also Pumphrey v. Coakley*, 684 F. App'x 347, 349 (4th Cir. 2017) (unpublished); *see also Celotex*, 477 U.S. at 322 n.4 ("A summary judgment . . . may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.") (quoting Fed. R. Civ. P. 56(c)).

## IV.    Conclusion

For the reasons stated above, the Motion (ECF 24) is GRANTED as to plaintiff's claims in Counts II and IX. And, the Motion is GRANTED IN PART and DENIED IN PART as to defendant's counterclaims in Counts I, II, and III.


Date: August 27, 2019                      _____/s/_____
                                           Ellen L. Hollander
                                           United States District Judge